**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **PRESIDIO, INC.,** *et al.*, | : |
| | : |
| **Plaintiffs,** | : |
| | : **Case No. 2:21-cv-05779** |
| **v.** | : |
| | : **Chief Judge Algenon L. Marbley** |
| **PEOPLE DRIVEN TECHNOLOGY, INC.,** | : **Magistrate Judge Elizabeth P. Deavers** |
| *et al.*, | : |
| | : |
| **Defendants.** | : |

| | |
|---|---|
| **PRESIDIO, INC.,** *et al.*, | : |
| | : |
| **Plaintiffs,** | : |
| | : **Case No. 2:22-cv-03838** |
| **v.** | : |
| | : |
| **PEOPLE DRIVEN TECHNOLOGY, INC.,** | : |
| *et al.*, | : |
| | : |
| **Defendants.** | : |

## OPINION & ORDER

## I.    INTRODUCTION

In 2016, the Engens sold their family business, Netech, to Presidio Infrastructure Solutions LLC ("PIS").  Five years later, the Engens started a new company—People Driven Technology, Inc. ("PDT")—which soon began competing with the affiliate of PIS, Presidio Networked Solutions LLC ("PNS"), that had taken on the former employees of Netech after it was acquired by PIS.  According to PNS, its parent company, Presidio, Inc., and its subsidiary, Presidio Networked Solutions Group LLC ("PNSG") (collectively, "the Presidio Plaintiffs"), PDT's approach to competition was illegal.  They therefore sued PDT and a handful of the employees

1

who left PNS for PDT—specifically, Joseph Schaumleffel, Thomas Schlotterer, Jeffery Ely, and Michael Martin (the "Individual Defendants")—in December 2021 for breach of contract, trade secret misappropriation, trademark infringement, and tort claims arising out of unfair competition ("the Lead Case"). They have also sued PDT and David Hatton, another employee who left PNS for PDT, for breach of contract and other tort claims, in a separate case ("the Member Case"); the two cases have now been consolidated.

Now before this Court are the parties' respective motions for summary judgment, as well as several threshold evidentiary motions. For the reasons set forth below, this Court **GRANTS** PDT's Motion to Preclude (ECF No. 173);[1] **GRANTS IN PART and DENIES IN PART** the Individual Defendants' Corrected Motion for Summary Judgment (ECF No. 189) and PDT's Motion for Summary Judgment (ECF No. 171); **DENIES** Plaintiffs' Motion to Strike (ECF No. 164), Motion for Partial Summary Judgment (ECF No. 177), and Motion to Strike (ECF No. 205); and **DENIES AS MOOT** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 176) and Defendants' Motion to Preclude (ECF No. 199).

## II. BACKGROUND

### A. Factual Background

#### 1. The Acquisition of Netech

On December 31, 2015, PIS and Presidio Holdings, Inc. ("Presidio Holdings"), agreed to purchase Netech Corporation ("Netech"), an IT services and solutions integrator headquartered in Grand Rapids, Michigan, for $250 million. (*See generally* Asset Purchase Agreement ("APA"), ECF No. 175-58). Netech was founded in 1996 by James Engen and his partners, and remained

---

[1] All references to filings on the docket refer to Case No. 2:21-cv-05779 unless otherwise noted.

privately-owned until the purchase. On the other side of the ledger, PIS was designated as the buyer and Presidio Holdings, which is an indirectly wholly-owned subsidiary of Presidio, Inc., was designated as the parent. (*See id.*).

As part of the purchase, PIS took on the entirety of Netech's business,[2] which was defined in the APA as "reselling internet protocol data and voice, data center, and physical security solutions services and hardware." (*Id.* at 1). PIS acquired "all rights in and to Intellectual Property relating to or arising out of the Business," "all goodwill of the Business," and "the name Netech and any derivation thereof." (*Id.* § 1.1(b)(i), (xx), (xxi)). PIS also assumed Netech's contracts with its employees, including "all of Seller's rights existing under Contracts relating to or arising out of the Business" and "all Liabilities and obligations with respect to Transferred Employees." (*Id.* §§ 1.1(b)(iv), 1.2(a)(iii)). The agreement allowed for PIS or one of its affiliates to offer employment to Netech's employees. (*Id.* § 5.6(a)).

The acquisition closed in early 2016. At that time, Netech assigned its employee agreements to PIS, pursuant to the Assignment and Assumption Agreement ("AAA"). These agreements included standard confidentiality and non-solicitation agreements. For example, Schlotterer signed a "Confidentiality/Non-Solicitation Agreement" with Netech on January 9, 2012, in which he agreed to keep all Netech proprietary information confidential and not to solicit any Netech employees to leave their positions for 12 months after his employment with Netech ended. (*See* Pls.' Ex. 3, ECF No. 175-4). He also agreed that: "[u]pon the cessation of his employment with Netech, [he would] (i) refrain from taking any such property from Netech's premises, and (ii) immediately return to Netech any such property which may be in my possession

---

[2] The parties generally use "Presidio" to refer to any or all of the Presidio entities collective. For reasons that will become clear, *see infra* Part IV.B, this Court refers to each Presidio entity separately—*i.e.*, as PIS or PNS, etc..

3

or control (including any and all copies thereof)." (*Id.* ¶ 2) (referring to "Netech keys, access codes, sales data, notes, tools, documents, records, and other equipment or property").

Each of the Individual Defendants signed an identical "Confidentiality/Non-Solicitation Agreement" when they joined Netech (collectively, "the Employment Agreements"). (*See generally id.*; Pls.' Ex. 4, ECF No. 175-5; Pls.' Ex. 5, ECF No. 175-6; Pls.' Ex. 6, ECF No. 175-7). So too did Hatton. Additionally, he signed a "Non-Compete Agreement," in which he agreed not to "directly or indirectly engage in any business with an existing or recent (within 6 months) customer of NETech Corporation's" or to "directly or indirectly solicit from any NETech current customer" for 12 months after the end of his employment with Netech. (Defs.' Ex. A, ECF No. 19-2 [No. 2:22-cv-03838]; *see also* Defs.' Ex. B, ECF No. 19-3 [No. 2:22-cv-03838]).

The AAA made clear that the assignments from Netech to PIS, including the assignments of the employment contracts, "will be binding upon, inure to the benefit of and be enforceable by and against such party and its legal representatives, successors, and authorized assigns." (AAA § 4, ECF No. 102-3). It also specified that the assigned rights are "for the sole and exclusive benefit of the parties hereto and their respective successors and permitted assigns" and could not be further assigned without consent from all parties. (*Id.* § 6). The only exception to this narrow list of beneficiaries was the "Parent," *i.e.*, Presidio Holdings, who was "entitled to exercise all rights and remedies granted to Buyer under this Agreement and to enforce this Assignment on behalf of and/or in the name of Buyer." (*Id.*).

After closing, PIS merged with and into PNSG, which is a wholly-owned subsidiary of PNS. (*See* PDT Answer ¶¶ 20, 56, ECF No. 141). Netech's employees, including Hatton and the Individual Defendants, were offered and accepted employment with PNS. Both PNS and PNSG are indirectly wholly-owned subsidiaries of Presidio, Inc. (*Id.* ¶ 6).

4

## 2. *The Engens Start PDT*

As part of the acquisition agreement, the Engen family—specifically, James, the founder of Netech, and his sons, Ryan and Timothy—agreed not to compete against any of the Presidio entities for five years. (APA § 5.4, ECF No. 175-58). In late December 2020, the Engens founded PDT. (*See* Pls.' Ex. 7, ECF No. 175-8). PDT began operations in April 2021, more than five years after the PIS acquisition of Netech closed.

PDT and PNS are value-added resellers ("VARs"), specifically for information technology ("IT") products and services. So was Netech prior to its acquisition by PIS. VARs design and implement solutions relating to enterprise and network security, cybersecurity, physical security, and other IT needs such as cloud computing services. They do not build their own equipment or hardware, but design, install, and troubleshoot systems for their customers using off-the-shelf hardware components made by other companies—*i.e.*, original equipment manufacturers ("OEMs"), like Cisco Systems, Inc. ("Cisco"). OEMs publish standard pricing for their equipment, which all VARs know, though in some cases a VAR might receive better pricing than its competitors for projects where it is the incumbent services provider. VARs then add a pricing margin to the equipment when they put together an overall bid for the client's proposed project. (*See* Martin Dep. 50:18–22, 52:2–16, ECF No. 178-19). The bid might include not just a list of hardware equipment (made by OEMs), but also a full set of services that cover the staging, procurement, and deployment of the hardware (and other, related services).

Once PDT was up and running, it began seeking clients, leaning heavily on the Engens' past success with Netech. On its website, it noted that: "[t]he Engen family has founded several successful business ventures, including most notably, a Value Added Reseller formerly known as Netech Corporation. Now they are returning to the tech industry . . . ." (PDT Answer ¶ 59, ECF

5

No. 141). Similarly, in outreach to potential clients, PDT account executives described their employer as a "reboot of Netech" and "Netech 2.0." (*E.g.*, Pls.' Opp'n Ex. 15, ECF No. 203-15).

PDT also sought to recruit PNS employees who had previously worked for the Engens at Netech and who appreciated the cultural similarities between PDT and Netech. (*See* Schaumleffel Dep. 154:2–8, ECF No. 175-3; *see also* Korreck Dep. 172:5–6, ECF No. 171-8). In fact, a substantial majority of current PDT employees are former employees of PNS. But the departure of employees for PDT is only part of a larger exodus of employees from PNS, across both engineering and sales teams, rooted in broader management issues. (*See* Raglow Dep. 70:4–12, ECF No. 171-6; *see also* Trautman Dep. 83:23–84:2, 88:12–17, 89:9–11, ECF No. 171-5; Koellmer Dep. 63:23–64:12, ECF No. 171-7). Many PNS employees are apparently leaving for new opportunities elsewhere, not just at PDT. (Korreck Dep. 153:14–155:10, 158:14–159:13, ECF No. 171-8).

Whether because of the marketing language or the departure of PNS employees for PDT, clients expressed some confusion about the new company. Communications intended for PDT employees frequently mixed up references to the two companies. (*See, e.g.*, Pls.' Opp'n Ex. 40, ECF No. 203-40). Some customers explicitly asked PDT account executives whether PNS had changed its name. (*See, e.g.*, Pls.' Opp'n Ex. 31, ECF Nos. 203-31). Others asked if PDT was affiliated with PNS. (*See, e.g.*, Pls.' Opp'n Ex. 38, ECF Nos. 203-38).

### 3. *The Individual Defendants and Hatton Leave PNS for PDT*

The Individual Defendants (Ely, Martin, Schaumleffel, and Schlotterer) and David Hatton are just a few of the PNS employees who have left for PDT. When they joined PNS in 2016 from Netech, they were asked to review and acknowledge the provisions of PNS's Employee Handbook & Code of Conduct (the "Employee Handbook"). Each did so. (*See* June 2022 Korreck Decl. ¶¶

9–11, ECF No. 87-4). According to the Employee Handbook, all work product created by PNS employees belong to PNS. (*Id.* Ex. A, ECF No. 87-5). They were also required to review and acknowledge the company's Cloud Services Policy, which prohibits employees from using personal cloud storage accounts for PNS business, in addition to other IT policies with various provisions intended to protect PNS confidential information. (*See id.* Ex. F, ECF No. 87-10; Zarum Decl. ¶ 13, ECF No. 87-27). These included requirements that PNS work be done exclusively on password-protected laptops, virtual private networks ("VPNs"), and file-sharing services. Compliance with these policies was monitored by the company's IT department. (Zarum Decl. ¶ 5, ECF No. 87-27).

Upon departing from PNS, the Individual Defendants and Hatton were required to follow the steps laid out in the company's Employee Exit Guide, which mandated the return of all PNS documents, records, and equipment, including work laptops; employees' access to their work phones, accounts, and PNS buildings were concurrently terminated by IT. (*See* October 2022 Korreck Decl. ¶ 20, ECF No. 5-2 [No. 2:22-cv-03838]).

The departures of the Individual Defendants and Hatton are set forth in greater detail below:

Jeffery Ely. Ely joined Netech in 2010, where he worked as a Solutions Architect. He took on the same role in 2016 at PNS. (*See* Ely Dep. 12:20–13:4, ECF No. 87-7). He was promoted to Solutions Architect Manager in 2018, and stayed with PNS until August 7, 2019, at which time he switched to a new opportunity at Expedient Data Center ("Expedient"). (*See id.* 10:24–11:10, 16:4–8). He then joined PDT as an Enterprise Architect in October 2021. In that role, he created technical designs and needs assessments for clients. (*Id.* 10:7–23).

Before he left PNS for Expedient, he backed up the files on his PNS laptop in two ways. First, he downloaded files to USB thumb drives, which he gave to other members of his team at

PNS to make sure they had a copy of his work. (*See id.* 18:1–16). Second, he backed up all files from his laptop, which totaled over 80,000 documents, onto an external hard drive he kept for himself. (*Id.* 20:3–18).

When he joined PDT, he migrated the documents on the hard drive to his new work laptop. (*Id.* 25:16–19). He would occasionally look at the documents in the course of his work at PDT, though he suggests that the files were largely useless because they consisted of "old data." "If [he] was talking with someone who [he'd] talked with in the past, [he] would refresh [his] memory as to, one, who it was, and what it was that . . they were doing in their business." (*Id.* 26:13–22, 72:3–8, 12–14). For example, Ely accessed seven (7) documents related to Avita Health on November 22, 2021, as PDT was preparing to bid on the 2022/2023 Network Refresh Deal for Avita during this period, in addition to dozens of documents for other clients around the same time period. (*See* Barnett Suppl. Report Ex. D-1, ECF No. 175-20). During a call about the planned bid, Ely and others were sent the bill of materials ("BOM") for a previous network refresh PNS had completed for Avita Health by Schaumleffel.[3] (*See* Ely Dep. 86:7–16, ECF No. 87-7). Tom Montes, a VP at PDT, immediately told everyone on the call to delete the file and the email, which Ely did. (*Id.* 88:6–9, 89:13–15).

<u>David Hatton</u>. Hatton joined Netech as a Systems Engineer in 2009, and joined PNS when Netech was acquired. Beginning in the spring of 2022, while he was still working at PNS, he and Bryan Teipel, the CEO of PDT, began discussing the possibility of him joining PDT. (Hatton Dep.

---

[3] The Individual Defendants suggest that Avita Health independently sent a copy of the same network files to Ely. In support, they cite an email from Brandon Reinhart to Ely, stating that Reinhart has "attached Network files that have been requested by other companies." (*See* ID Ex. U, ECF No. 178-21). While this email is certainly suggestive, this Court has no way of determining whether the "attached Network files" are in fact the same files as the Presidio/Avita Comprehensive Proposal document that Schaumleffel circulated, as the Individual Defendants have failed to enter the "attached Network files" into the record. And, in fact, Plaintiffs suggest that the documents are not the same. (*See* Mot. to Strike Ex. U at 2 n.1, ECF No. 205).

92:10–25, ECF No. 175-13). He accepted an offer to join PDT a few months later. (*Id.* 93:21 – 95:14). He submitted his letter of resignation to PNS on June 27, 2022, and finished his time there on July 8, 2022. (*See id.* 146:15–17).

On his last day, he participated in an exit interview with Alicia Korreck, a member of the HR team at PNS. During the interview, Korreck told him that, based on the non-compete and non-soliciation agreements he had signed with Netech, he was not permitted to work on any projects for current or recent PNS customers or to solicit PNS customers for twelve months. (*Id.* 206:21–207:19). Before he started at PDT, he discussed and shared copies of the agreements with Montes, Teipel, and PDT's counsel. (*See id.* 95:18–96:1, 120:7–122:10, 124:2–125:13).

After Hatton joined PDT, he began working with and providing services to the same clients he had previously worked with at PNS, including Ohio University, General Dynamics Land Systems ("GLDS"), Shawnee State University, Meijer, Meijer Gardens, Avita Health, Multi-Color, and the City of Marysville. (*Id.* 15:21–16:14, 26:5–15, 56:24–57:1, 82:24–82:4). In some cases, he laid the groundwork before he had left PNS, informing his contact at Shawnee State, for example, of his personal cell number and later inviting Shawnee State to work with him at PDT via his personal cell. (*See id.* 46:20–47:8, 51:9–53:20). Additionally, PNS's contact at Multi-Color told PNS that Hatton had informed him that Ramesh Medikonda, a PNS engineer, was too busy with other work to provide services to Multi-Color; this, however, was not true. (*See* Kerr Decl. ¶¶ 11–12, ECF No. 5-1 [No. 22-cv-03838]).

<u>Michael Martin</u>. At PNS, Martin worked as a Senior Account Executive, servicing clients in the northern Ohio and Detroit areas. (*See* Martin Dep. 12:5–19, ECF No. 87-15). His portfolio included several public sector accounts, including public school districts and community colleges. In 2021, as part of an internal reorganization at PNS, he was slated to lose these accounts. At that

9

point, he had already lost the Toledo Public Schools, which had fired PNS. (*Id.* 15:15–20, 16:2–9). Partly because of this expected decrease in work, he decided to leave PNS. He was offered a position at PDT on July 7, 2021, resigned from PNS the following month, and started his new job at PDT on September 7, 2021. (*See id.* 11:19–21, 152:16–25; *see also* Pls.' Ex. 21, ECF No. 175-22; Pls.' Ex. 22, ECF No. 175-23).

Before leaving PNS, Martin first transferred a folder from his PNS laptop to his wife's USB drive. (Martin Dep. 33:4–20, ECF No. 87-15). The folder included documents related to Martin's work at PNS with two clients, The Andersons and Premier Bank, such as Cisco Commerce Workspace ("CCW") downloads, which are essentially computer design and build documents. (*Id.*; *see also id.* 26:21–25; Pls.' Ex. 25, ECF No. 175-26). Martin testified that he copied over some of the files for The Andersons intentionally, as a way to remember the formatting of documents he had prepared for the client. (*See id.* 71:20–72:22). Other documents that Martin had created for his clients as a PNS employee, including quotes, pricing estimates, and statements of work, were also found on his PDT laptop. (*See* Pls.' Ex. 25, ECF No. 175-26; *see, e.g.*, Pls.' Ex. 26, ECF No. 175-27).

Forensic evidence shows that Martin repeatedly accessed the files on his wife's hard drive that he had transferred from his PNS computer. He accessed files from the hard drive on September 1, 2021, right before he joined PDT, and then on September 28 and 29, 2021, after he had joined; he also accessed files on October 6, 7, and 19, November 30, and December 6, 2021. (Barnett Suppl. Report Ex. E-1, ECF No. 203-8). In total, between September 2021 and January 2022, Martin accessed dozens of PNS files related to The Andersons. (*See id.* Exs. E-1, F-1). During that time, he was helping prepare PDT's bid on the FLEX renewal project for The Andersons.

10

Additionally, some of the PNS documents found on Martin's PDT laptop were sent to him by PNS clients he had previously worked with as a PNS account executive. Several times, Martin directly asked his contact at a PNS client to send him the PNS quote or other PNS information. (*See, e.g.*, Pls.' Ex. 38, ECF No. 171-39; Pls.' Ex. 39, ECF No. 171-40). In other cases, Martin reached out to the client once he joined PDT, and the client sent him PNS quotes without an explicit request. (*See, e.g.*, Pls.' Opp'n Ex. 28, ECF No. 203-28). Martin then circulated the quotes to other PDT team members to discuss and, at least in one case, used the old PNS quote as the model based on which he prepared a new quote for the same customer on behalf of PDT. (*See* Pls.' Opp'n Ex. 24, ECF No. 203-24).

After Martin joined PDT, he also began soliciting Schlotterer, encouraging him to leave PNS for PDT. (*See* Martin Dep. 109:24–116:3, ECF No. 87-15). He told Schlotterer that it would be easier to recruit clients to PDT if Schlotterer joined and spoke to PDT's consultant, Bill Murray, about the possibility (Murray then called Schlotterer a week later). (*Id.* 90:20–24, 93:8–94:1). He did so despite his understanding at the time that the Confidentiality/Non-Solicitation Agreement he had signed with Netech prevented him from soliciting any PNS employees for 12 months after his departure from PNS. (*See id.* 84:10–85:3).

Joseph Schaumleffel. Schaumleffel has been working as an account executive for IT VARs for a long time, having worked with Avita Health even before he joined Netech. (*See* Schaumleffel Dep. 17:17–21, ECF No. 171-14). He continued working with Avita first at Netech and then later at PNS. But, like Martin, he was worried that the reorganization being implemented at PNS in 2021 would lead to a major loss in his book of business. (*See id.* 15:15–20, 52:16–53:21; *see also* Koellmer Dep. 292:1–23, ECF No. 171-7). He therefore made the decision to join PDT in August, having received an offer letter on July 26, 2021. (*See* Pls.' Ex. 17, ECF No. 175-18). He officially

11

left PNS and joined PDT in late November 2021. (*See* Schaumleffel Dep. 14:1–3, 28:16–29:13, ECF No. 171-14). Thus, for the last few months of his employment with PNS, he had already agreed to join their competitor, without informing his PNS supervisor of his plans. (*Cf. id.* 30:25–32:9).

In October 2021, prior to leaving PNS, he downloaded client files from his PNS laptop to an external USB drive. (*See id.* 46:16–19). Schaumleffel suggests that he did so to keep a record of the projects he had recently won or was in the process of winning for PNS, to ensure that PNS would pay him his full commission, which they had previously failed to do several times. (*Id.* 46:20–47:8). Upon joining PDT, he was promptly included in the account team for Atomic Credit Union, and accessed the files for Atomic that he had downloaded from his PNS laptop. (*See* Pls. Opp'n Ex. 19, ECF No. 203-19; Barnett Suppl. Report Ex. B-1, ECF No. 203-8). In total, it appears that he accessed approximately 30 files on November 30, 2021, related to both Atomic Credit Union and Avita Health. (*See* Barnett Suppl. Report Ex. B-1, ECF No. 203-8). PDT then provided a quote to Atomic Credit Union for the same opportunity that Schaumleffel had just quoted a week earlier on behalf of PNS. (*See* Pls.' Opp'n Ex. 50, ECF No. 203-50).

Another file Schaumleffel downloaded to the external USB was the "OhioHealth 2020 Cisco Smart-Net RFP" document. (*See* Schaumleffel Dep. 70:7–9, ECF No. 171-2). Schaumleffel testified that he copied this folder to the USB accidentally, because he intended to copy the OhioHealth folder but did not look through each sub-folder before doing so. (*See id.* 71:10–72:2). Before he left PNS, he also took pictures of all of his contacts at OhioHealth on his phone and emailed those pictures to his personal email. (*Id.* 66:2–9).

In addition to downloading files to a USB drive, Schaumleffel emailed Excel spreadsheets related to his PNS work (the "Customer Data Files") to his personal email on November 19, 2021,

right before his departure from PNS. The spreadsheets included PNS's pricing and margin information for 32 customers, who accounted for over $10 million in annual revenue for PNS. (*See* Trautman Decl. ¶ 13, ECF No. 8-21). Schaumleffel asserts that the pricing and margin information, which date back to 2015 and 2017, was "obsolete" by the time he brought it to PDT. (Schaumleffel Dep. 248:7–12, ECF No. 175-2). He also testified that he kept these documents for the same reason that he copied files to the USB drive: to make sure he was compensated properly by PNS, by keeping track of the deals he had won. (*See id.* 249:5–18).

Schaumleffel asserts that the Presidio/Avita Comprehensive Proposal document is likewise obsolete and carries "no weight" because of its age. (*See id.* 109:6–17, 130:3). This is the file that he shared with Ely, Montes, and Dave Benham, during a meeting about PDT's planned bid for a network refresh project for Avita Health. (*See id.* 126:9–25). The document includes the pricing and bills of materials that PNS had prepared for the previous Avita network refresh project, which PNS had won and executed. In circulating the document, Schaumleffel intended for it to serve as "a starting point" for the PDT team; he wanted to help Benham, one of the engineers, get "up to speed," even though he claims that the pricing and architecture of the PNS work described in the document held "no weight" for the new proejct. (*Id.* 127:1–5, 130:1–3; *see also* Pls.' Ex. 10, ECF No. 175-11). Schaumleffel was severely reprimanded by Montes for showing the document, but was not barred from continuing to work on the Avita Health account. (*See* Schaumleffel Dep. 126:16–17, 156:21–25, ECF No. 175-2).

PNS lost the Avita network refresh job to PDT. Schaumleffel suggests that other factors led to that outcome. One factor was Jeff Ely. Schaumleffel testified that Ely was a "rock star," the "star in everything"—Avita Health wanted to work with Ely, wherever he went, and the fact that he had joined PDT meant that Avita Health was always likely to follow. (*See id.* 125:4–14).

He also suggests that PNS lost the deal due to its own mistakes in prioritizing Cisco equipment, missing the bidding deadline twice, and going over-budget. (*See id.* 121:20–122:1, 257:7–259:3). But Avita had told PNS that it went with PDT instead, because PDT's bid had been more competitive on price—which was the decisive factor. (*See* Trautman Decl. ¶ 15, ECF No. 87-1).

Thomas Schlotterer. Schlotterer worked as a Systems Engineer at Netech and then PNS, until he joined PDT as a Senior Systems Engineer on October 26, 2021. In those roles, he prepared network diagrams, call flow diagrams, python files, and configured systems for clients. At PNS, he worked primarily with various public school districts and institutions, in addition to Premier Bank. (*See* Schlotterer Dep. 41:23–42:11, ECF No. 175-2). For Premier Bank, he helped with designing, implementing, and installing network, wireless, and firewall configurations. (*Id.* 43:21–44:13).

In early 2021, Schlotterer began looking at new opportunities, investigating possible job openings at Cisco, Scale Technologies, and Zoom. (*Id.* 63:12–23). Martin, having already joined PDT, had mentioned to him that there might be an opening at PDT for him; soon after, he received a call from Murray about the possibility of joining PDT. (*See id.* 62:1–63:2). He met with Teipel on October 5, 2021, about the opportunity and received an offer letter on the same day with a higher total compensation than he was receiving from PNS. (*See id.* 114:2–117:17). He submitted his letter of resignation to PNS on October 11, 2021, and left 11 days later. (*See* ID Ex. P, ECF No. 178-16).

Between October 8 and October 22, 2021, when Schlotterer left PNS, he downloaded tens of thousands of documents relating to PNS customers to a personal device, including a zip file containing work product that he had prepared for Premier Bank while at PNS. (Schlotterer Dep. 132:11–15, ECF No. 175-2). He explains that he had been periodically told at PNS to back up his

14

work product whenever he received a new laptop, though it is not clear whether this directive entailed creating a backup on a personal device. (*See id.* 131:9–18). He also explains that, specifically with respect to the "Premier Bank Visio.zip" file, which included all of the work he had done for Premier Bank, he wanted to make sure that the client was not harmed by his departure from PNS in case there were any files misplaced as PNS bedded in his replacement. (*See id.* 132:16–21; *see also id.* 224:20–225:4).

Schlotterer uploaded the zip file to his contact at Premier Bank before he left. (*Id.* 132:22–24). The zip file contained everything he had worked on for Premier Bank for the prior five years, including a list of every phone number owned by Premier Bank, call flow documents, network diagrams, and python files that Schlotterer had created. (*Id.* 133:14–18, 136:9–25). In total, the folder included approximately 12,900 files and folders. (*See* Barnett Decl. ¶ 15, ECF No. 8-2).

After Schlotterer joined PDT, Premier Bank sent the "Premier Bank Visio.zip" file back to Schlotterer so that he could work on a project for it in his new role at PDT. (*See* Schlotterer Dep. 137:10–23, ECF No. 175-2). He immediately saved the zip file to his PDT laptop and uploaded the files to the company-wide OneDrive, to which all PDT employees had access. (*Id.* 176:19–177:23). He worked on two projects for Premier Bank—the Red Sky and Acadian Labs projects—which he had previously been involved in as a PNS employee. (*See id.* 185:7–25). In doing so, he used some of the information from the zip files; he accessed files related to Premier Bank at least six times between November 4 and December 10, 2021. (*Id.* 139:14–21; Barnett Suppl. Report Ex. C, ECF No. 203-8).

Schlotterer's managers and higher-ups at PDT were aware of the Premier Bank zip file. He had told Dean Lochkovic, a VP at PDT, for example, that he had prepared a zip file of his work product for Premier Bank and sent it to Premier Bank before he left PNS, and then that Premier

15

Bank sent it back after he joined PDT. (Schlotterer Dep. 145:7–15, ECF No. 175-2). Matt McPherson at PDT was also made aware of the zip file, when Schlotterer had an issue uploading the files to the shared OneDrive. (*Id.* 177:24–178:6; Pls.' Ex. 14, ECF No. 175-15). Since then, Premier Bank has informed PNS that it would no longer be working with PNS.

### 4.    *Presidio Entities Bring Suits Against PDT*

The Individual Defendants and Hatton are not the only PNS employees who have left for PDT and used files originating from PNS in their new roles at PDT. For example, Douglas Quackenbush, a PDT account executive, previously provided quotes for the SDWAN projects for GDLS while he was employed at PNS, and then provided quotes for the same project after he had joined PDT while still in possession of the original PNS quote. (*See* Quackenbush Dep. 69:11– 13, 72:16–19, 98:18–20, 102:13–17, ECF No. 175-43). Quackenbush sent Roush a wireless survey report that had been copied directly from the report PNS had put together for the same customer. (*See* Pls.' Opp'n Ex. 45, ECF No. 203-45; Pls.' Opp'n Ex. 46, ECF No. 203-46). Copying and re-sending also occurred with respect to BAMF Health. Other PDT employees—like Steve TerHaar and Dawn Batson—accessed client files originating from PNS when servicing the same clients at PDT. (*See, e.g.*, TerHaar Dep. 153:10–17, ECF No. 203-1; Pls.' Opp'n Ex. 8, ECF No. 203-8; Barnett Report § 3.2, ECF No. 195-2).

In response to the actions of Hatton, the Individual Defendant, and others, the Presidio Plaintiffs brought suit against PDT and various individuals in this Court on December 14, 2021, in the U.S. District Court for the Eastern District of Michigan, and in the Delaware Court of Chancery. (*See Presidio, Inc., et al. v. Terhaar et al.*, No. 2:22-cv-10118 (E.D. Mich.); *Presidio, Inc., et al. v. Closson*, No. 2022-0277 (Del. Ch.)).

16

After Plaintiffs filed this suit, Teipel held an all-hands meeting, at which he told PDT employees not to use documents or information from their prior employment. (May 2022 Teipel Dep. 70:15–71:3, ECF No. 171-12; January 2023 Teipel Dep. 220:8–15, ECF No. 171-13). Teipel claims that he had already been telling new hires not to bring PNS information with them, though Schlotterer does not recall being told that. (*See* May 2022 Teipel Dep. 145:14–146:14, ECF No. 171-12; Schlotterer Dep. 172:24–173:8, ECF No. 175-2). After the all-hands meeting, several PDT employees, including Martin, reached out to Teipel, informing him that they possessed Presidio information. (May 2022 Teipel Dep. 71:16–73:19, ECF No. 171-12). Teipel told Martin to leave the files in place, while waiting for a third party to remove the files; he expressed no concerns about Martin continuing to use the laptop in the meantime. (*Id.* 73:7–11, 76:12–18). Nor did he direct any further investigation into the possession or use of such files. (*See id.* 78:1–5, 80:15–81:9).

PDT hired Axis Discovery, a third party, to conduct remediation by removing PNS files from its employees' devices. The remediation was done on a voluntary basis: in order to identify files that needed to be deleted, Axis relied exclusively on PDT employees self-reporting that they possessed PNS files. (*See* Fannon Dep. 53:9–54:11, ECF No. 251-4). Axis also prepared a script to run on employee laptops to determine if files had been copied from the OneDrive; however, this script was run only on a limited number of employee laptops. (*Id.* 70:22–72:6). Some of the files subject to remediation apparently remain on PDT's company-wide OneDrive, though they cannot be accessed. (May 2022 Teipel Dep. 109:22–110:21, ECF No. 175-59).

Also in mid-December 2021, PDT fired Schaumleffel and Schlotterer. Teipel told Schlotterer that he had been let go because PDT hoped that doing so would end this lawsuit. (Schlotterer Dep. 202:18–23, ECF No. 175-2). Martin, Ely, and Faber, who kept approximately

17

30,000 PNS files on a personal hard drive after he left PNS for PDT and later used those documents as the basis for client work at PDT, remain with the company. (*See* Faber Dep. 26:15–20, ECF No. 171-18).

### B. Procedural Background

As noted above, Presidio, Inc., PNS, and PNSG filed suit against PDT, Schaumleffel, and Schlotterer, in December 2021. The parties agreed to a series of stipulated temporary restraining orders ("TROs") and preliminary injunctions ("PIs"), in which PDT and the Individual Defendants agreed to refrain from using, disclosing, copying, or transmitting confidential or trade secret information, and to turn over certain devices to an independent, third-party forensic expert, Vestige, Ltd., for examination. (*See, e.g.*, Mot. for Stipulated TRO, ECF No. 20; Stipulated PI, ECF No. 44; Stipulated Renewed PI, ECF No. 111).

Plaintiffs filed an amended complaint on October 28, 2022, adding Ely and Martin as additional defendants. (*See* First Am. Compl., ECF No. 126). Around the same time, Plaintiffs filed a separate case in this Court, against PDT and David Hatton; the two cases have since been consolidated. (*See generally* ECF, No. 2:22-cv-03838).

At the conclusion of fact and expert discovery, Plaintiffs filed motions for partial summary judgment against PDT and the Individual Defendants in the Lead Case and against PDT and Hatton in the Member Case. (*See* Pls.' Mot. for Partial Summ. J. ("Presidio MSJ I"), ECF No. 176; Pls.' Mot. for Partial Summ. J. ("Presidio MSJ II"), ECF No. 177). PDT has filed a motion for summary judgment on all counts. (*See* PDT Mot. for Summ. J. ("PDT MSJ"), ECF Nos. 171). So, too, have the Individual Defendants. (*See* Defs.' Corr. Mot. for Summ. J. ("ID MSJ"), ECF No. 189). And, as ordered by this Court following the evidentiary hearing held on May 16–17, 2023, during which this Court ordered a limited reopening of discovery, the parties filed supplemental motions for

summary judgment. Finally, the parties have filed various evidentiary motions, seeking to exclude expert reports, the use of certain experts, and certain exhibits. All motions are now ripe for review.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)). Summary judgment is inappropriate, however, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Evidence that is "merely colorable" or "not significantly probative" is not enough to defeat a motion for summary judgment, *id.* at 249–50 (citations omitted), nor is "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position" sufficient. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

The initial burden rests upon the movant to present the Court with law and argument in support of its motion, and to identify the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56). The movant can also "challenge the opposing party to 'put up or shut up,'" *i.e.*, by "asserting that the opposing party will not be able to produce

19

sufficient evidence at trial to withstand a directed verdict motion." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). The burden then shifts to the nonmoving party to set forth specific facts showing that there remains a genuine issue for trial. *See also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (noting that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

Where the parties have filed cross-motions for summary judgment, each party bears the responsibility of meeting its burden to demonstrate that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. The standard of review for cross-motions does not differ from the standard applied by this Court where only one party moves for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted).

## IV. LAW & ANALYSIS

In the First Amended Complaint in the Lead Case, Plaintiffs bring nine claims against PDT and the Individual Defendants, alleging: breach of contract as to the Individual Defendants (Count 1); misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), Pub. L. 114-153, 130 Stat. 376, and the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code § 1333.61 *et seq.*, as to all Defendants (Counts 2 and 3); trademark infringement and false designation of origin pursuant to the Lanham Act of 1940, 15 U.S.C. §§ 1114, 1125, and the Ohio Deceptive Trade Practices Act ("ODTPA"), Ohio Rev. Code § 4165.02, as to PDT (Counts 4, 5, and 6); and various tort claims, specifically, unfair competition, unjust enrichment, and tortious interference with business relationships, as to all Defendants (Counts 7, 8, 9). (*See generally* First Am. Compl., ECF No. 126). In the Member Case, Plaintiffs allege that Hatton is in breach of contract, that Hatton and PDT have tortiously interfered with business relationships,

20

that PDT has tortiously interfered with Hatton's employment agreements, and that Hatton and PDT have engaged in unfair competition. (*See* Compl., ECF No. 1 [2:22-cv-03838]).

Plaintiffs move for summary judgment on the breach of contract claims in both cases and trade secret misappropriation claims in the Lead Case, PDT and the Individual Defendants on all claims. But before discussing the merits, this Court first addresses the parties' threshold evidentiary motions.

### A.     Threshold Motions

#### 1.     Motion to Strike the Fannon Expert Report (ECF No. 164)

Under the Federal Rules, parties are permitted to designate rebuttal experts, whose testimony must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party." FED. R. CIV. P. 26(a)(2)(D)(ii). In other words, "[t]he purpose of rebuttal reports is not to advance new arguments or new evidence outside the scope of the opposing expert's testimony." *Sinomax USA, Inc. v. Am. Signature, Inc.*, No. 2:21-cv-03925, 2022 WL 7180339, at *2 (S.D. Ohio Sept. 30, 2022) (internal quotation marks and citation omitted). Plaintiffs suggest that the Fannon Report goes beyond the scope of the expert report that it rebuts, in contravention of Rule 26, and therefore ask for the report to be struck.

The Fannon Report purports to rebut the Barnett Report, which reviewed system artifacts on the PDT laptops of TerHaar, Sutherland, and Batson. The Barnett Report concluded *inter alia* that all three PDT employees likely accessed files originating from PNS on their laptops. (*See* Barnett Report §§ 3.1–.3, ECF No. 165-1). Barnett also wrote that, based on three Vestige file listings, "it would be appear that certain of these files have *Last Accessed* dates that could show potential usage of the information contained in those files." (*Id.* § 3.4). But he did not provide any conclusions as to whether the files actually had been used. He noted that further examination

21

of system artifacts would be necessary to draw any such conclusions and ended by explaining that he was "unable to determine if these files have been accessed by users" at that time. (*Id.*). Subsequently, Barnett prepared a supplemental report after the expert discovery deadline had expired, in which he discusses and opines on the extent of the Individual Defendants' access to files originating from PNS. (*See* Barnett Suppl. Report, ECF No. 175-21).

Fannon, who had been initially hired by PDT as part of the Axis Discovery team tasked with remediating PNS files found on PDT devices, filed his rebuttal report after Plaintiffs had submitted the Barnett Report but before they submitted the Barnett Supplemental Report. (*See* Fannon Report § 1, ECF No. 171-20) (noting that he had "been asked to prepare this report in response to the Expert Report of Alex Barnett"). His report is focused entirely on remediation— *i.e.*, on the steps taken to image PDT employee devices and remove files from those devices. (*See generally id.*). That focus is intended to rebut the last section of the Barnett Report, excerpted above, in which Barnett noted that PNS files may have been accessed pending further analysis; PDT argues that its employees could not have accessed PNS files that were remediated.

Plaintiffs argue that the Fannon Report is outside the proper scope of a rebuttal report because the sole statement in the Barnett Report on access was not intended as an opinion, but rather merely as an open-ended possibility requiring verification. Of course, the fact that Barnett followed up that statement with a full supplemental report undermines Plaintiffs' argument; it appears clear that Barnett intended for the statement to leave open the door for further opinions about use or access. And because the Barnett Supplemental Report, which discussed extensively the Individual Defendants' (and others') access of files originating from PNS, was filed after the deadline for expert discovery had passed, Fannon never had an opportunity to rebut those opinions. In other words, the Fannon Report, which discussed the steps Axis had taken to prevent any use

22

or access, properly responded to both the open-ended invitation in the Barnett Report to opine on access and to the opinions contained in the untimely Barnett Supplemental Report.

Accordingly, this Court finds that the Fannon Report is within the scope of an expert rebuttal report. Plaintiffs' Motion to Strike (ECF No. 164) is **DENIED**.

> 2. *Motion to Preclude Testimony from Morettini and Seidl (ECF No. 173)*

A similar issue is presented in Defendants' Motion to Preclude (ECF No. 173), which argues that Plaintiffs should not be permitted to rely on the testimony of its rebuttal trade secret experts, Phil Morettini and Randy Seidl. As noted, rebuttal evidence under Rule 26 must be "responsive to [affirmative] information by the other party." *See In re Air Crash Disaster*, 86 F.3d 498, 528 (6th Cir. 1996). In other words, rebuttal evidence can only be put forward "to challenge the evidence or theory of an opponent—and not to establish a case-in-chief." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (citing *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991). So, too, for rebuttal experts.

In this case, Plaintiffs have designated Morettini and Seidl as rebuttal experts on the issue of trade secrets. Defendants argue that Plaintiffs should be precluded from relying on the evidence or testimony of Morettini and Seidl in their case-in-chief; Defendants also argue that, because Defendants do not rely on any of their three affirmative experts on the trade secrets issue in their motions for summary judgment, Plaintiffs should be precluded from relying on the evidence or testimony of Morettini and Seidl in their opposition to Defendants' summary judgment motions. (*See* Defs.' Mot. to Preclude at 2–6, ECF No. 173). Plaintiffs do not dispute this request. They explain that they have scarcely relied on Morettini or Seidl in their opening briefs, and only as supplemental support, and that they do not do so at all in their memoranda contra. And with respect to trial, Plaintiffs will not call Morettini and Seidl in their case-in-chief at trial and will not call

them as rebuttal experts if Defendants do not call their primary trade secret experts. (Pls.' Resp. to Mot. to Preclude at 1–2, ECF No. 204).

As the parties concur that Morettini and Seidl must be precluded, Defendants' motion is **GRANTED**. Plaintiffs may not rely on Morettini and Seidl in their case-in-chief, at summary judgment or at trial, and may not rely on them in rebuttal if Defendants do not call any of their trade secret experts.

### 3.     *Motion to Preclude the Barnett Supplemental Report (ECF No. 199)*

Defendants also moved to preclude the supplemental report of Alex Barnett as untimely disclosed, but withdrew that motion after the evidentiary hearing held before this Court on May 16–17, 2023. (*See* Defs.' Mot. to Preclude, ECF No. 199; Defs.' Reply in Support, ECF No. 233). As such, the motion is **DENIED AS MOOT**.

### 4.     *Motion to Strike Exhibit U (ECF No. 205)*

The final threshold motion relates to Exhibit U to the Individual Defendants' Motion for Summary Judgment, which Plaintiffs seek to strike. (*See* ID Ex. U, ECF No. 178-21). Exhibit U details an email sent by an employee at Avita Health to Jeffery Ely on November 23, 2021, in which the employee states that he has "attached the Network files that have been requested by other companies." (*Id.*). The Individual Defendants cite this email in support of their argument that Avita (and other clients) voluntarily sent to PDT employees and others the PNS documents that Plaintiffs accuse them of misappropriating.

This document was included in a discovery production made by PDT to Plaintiffs in early March 2023; because other documents in the production contained privileged information, PDT clawed back the document. (*See also* Pls.' Ex. A, ECF No. 205-1). Despite the claw-back, Individual Defendants filed a redacted version of the email in support of their summary judgment

motion.  Plaintiffs requested that the Individual Defendants provide an unredacted copy of the document, which they had never seen until that point.  (*See* Pls.' Ex. C, ECF No. 205-3).  After some back and forth, the Individual Defendants eventually disclosed the full email and attachments on April 18, 2023, four days before the deadline for opposition briefs.  (*See* Pls.' Ex. D, ECF No. 205-4).  Plaintiffs now move to strike the exhibit as an untimely disclosure under Rule 37.

The parties do not dispute the facts set forth above, or the conclusion that Exhibit U was untimely disclosed.  They do dispute, on the other hand, whether the untimely disclosure was harmless or substantially justified under the five-factor test adopted by the Sixth Circuit in *Howe v. City of Akron* for determining when Rule 37 sanctions are appropriate for discovery violations.  801 F.3d 718 (6th Cir. 2015).  These factors are:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* at 748 (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014).  In this case, the test favors admission of Exhibit U.

*First*, the surprise factor clearly favors Plaintiffs: they could not fairly expect that a document PDT had clawed back would be used in support of the Individual Defendants' summary judgment motion.  *Second*, Plaintiffs at this juncture have no avenue for conducting further discovery to address the email and cannot cure the surprise.  *Third*, while any reopening of discovery would disrupt the compressed trial schedule in this matter, the disruption to trial is minimal given the volume of evidence already produced in this case (in comparison to which a single email thread is near negligible) and the minimal prejudice to Plaintiffs of admitting the exhibit, *see infra*.  *Fourth*, the prejudice to Plaintiffs is small.  The parties have produced hundreds

of thousands of documents in this case. One additional email, which, moreover, is fully consistent with the same defense that the Individual Defendants have relied on throughout the case (*i.e.*, that they were sent PNS quotes and pricing documents by their clients and did not acquire those documents by improper means), is unlikely to be decisive—nor do Plaintiffs suggest that it is so. (Pls.' Reply in Support at 6–7, ECF No. 233) (arguing that Exhibit U is not important evidence). And even if the document was important or prejudicial, Plaintiffs had four days to prepare an adequate response before filing their memorandum contra. *Fifth*, the Individual Defendants' explanation that the disclosure was untimely due to an inadvertent claw-back is eminently plausible. *See Bisig v. Time Warner Cable*, 940 F.3d 205, 219 (6th Cir. 2019) (noting that Rule 37 operates to strike discovery violations arising from "underhanded gamesmanship" rather than honest mistakes (citations omitted)).

Based on the *Howe* factors, this Court finds that the untimely disclosure of Exhibit U was not prejudicial. Accordingly, Plaintiffs' Motion to Preclude Exhibit U (ECF No. 205) is **DENIED**.

## B. Breach of Contract

Under Ohio law, it is well-settled that a plaintiff who seeks to prevail on a breach of contract claim must show: "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff." *Wellington Res. Grp. LLC v. Beck Energy Corp.*, 975 F. Supp. 2d 833, 837 (S.D. Ohio 2013) (citation omitted). At issue before this Court is whether the first element has been met—*i.e.*, whether there existed a valid and enforceable contract between the Individual Defendants and PNS that would enable to Plaintiffs to bring suit. For the reasons that follow, this Court answers the question in the negative and therefore finds that summary judgment is appropriate in favor of the Individual Defendants.

26

Plaintiffs' breach of contract claim alleges that the Individual Defendants violated the Employment Agreements by using confidential PNS information to work with and service PNS clients as PDT employees less than 12 months after leaving PNS (the claim against Hatton alleges breach of contract with respect to both the Confidentiality/Non-Solicitation Agreement and the Non-Compete Agreement ("the Hatton Agreements"), which he signed but the Individual Defendants did not). Of course, for such a claim to be viable, it must be the case that PNS—as the former employer of the Individual Defendants—has a right to enforce the relevant provisions of the Employment Agreements (or the Hatton Agreements). Otherwise, PNS cannot bring a breach of contract claim, and the other Presidio Plaintiffs have not performed since they did not employ the Individual Defendants or Hatton.

The Individual Defendants and Plaintiffs have both moved for summary judgment on this claim. (*See generally* Presidio MSJ I at 26–31, ECF No. 176; Presidio MSJ II at 47–57, ECF No. 177; ID MSJ at 18–25, ECF No. 189). Since the parties filed their motions, this Court has issued its decision on PDT and Hatton's motion to dismiss in the Member Case. (*See* Op. & Order, ECF No. 96 [2:22-cv-03838]). In that decision, this Court found that the non-solicit and non-compete agreements Hatton signed with Netech were not assigned to PNS, and therefore dismissed the breach of contract claim against Hatton and the tortious interference with employment agreements claim against PDT. (*Id.* at 14–16). As these are the same two claims from the Member Case that now form the basis of Plaintiffs' Motion for Partial Summary Judgment (ECF No. 176) against PDT and Hatton, the motion is **DENIED AS MOOT**. The same logic, as explained more fully below, applies to the Individual Defendants' employment agreements with Netech.

It is undisputed that the Individual Defendants signed employment agreements with Netech, in which they agreed to keep Netech information confidential and not to solicit Netech

27

employees for 12 months after their terms of employment with Netech ended. (*See, e.g.*, ID Ex. A, ECF No. 178-1). It is also undisputed that, when the PIS acquisition of Netech closed in 2016, PIS was assigned Netech's rights, including the rights set forth in the Employment Agreements. (*See* AAA § 4, ECF No. 102-3). The rights are "binding upon, inure to the benefit of and enforceable by and against [PIS] and its legal representatives, successors and authorized assigns." (*Id.*). PIS could only assign the rights further with consent from all parties. (*Id.* § 6). In other words, at closing, the following parties could enforce the rights in the Employment Agreements: PIS, as the purchaser of Netech; any of PIS's legal representatives, successors, and authorized assigns; and Presidio Holdings, as the designated "Parent."

After the acquisition closed, PIS merged into PNSG, which is a wholly-owned subsidiary of PNS. (*See* Answer ¶¶ 5, 9, ECF No. 33 [2:22-cv-03838]). As PIS's successor-by-merger, PNSG is authorized to enforce the rights in the employment agreements that were assigned to PIS by Netech. But PNSG did not employ the Individual Defendants. PNS did.

Nothing in the AAA or APA contemplates PNS either benefiting from or enforcing the Employment Agreements. Consider each of the options. *First*, it is self-evidently not PIS, the purchaser of Netech and the assignee of Netech's rights. *Second*, equally clear is that PNS is not Presidio Holdings, which was explicitly given the authority to enforce the rights assigned by Netech to PIS in the AAA. *Third*, no party suggests that PNS is an "authorized assign" or "permitted assign" of PIS; it is not explicitly set out as such in Sections 4 or 6 of the AAA. *Fourth*, Plaintiffs focus on the language in the AAA allowing for the "legal representatives" of PIS to enforce the assigned rights. (*See* Pls.' Resp. in Opp'n at 14, ECF No. 209). But a "legal representative" in the corporate law context is typically understood to refer to an attorney with the legal authority to act or appear on behalf of a corporate entity. *See Representative*, BLACK'S LAW

28

DICTIONARY (11th ed. 2019) (defining "legal representative" as either a "lawful representative," *i.e.*, a legal heir or an executive, administrator or other legal representative, or a "personal representative"); *cf. Bass v. Leatherwood*, 788 F.3d 228, 230 (6th Cir. 2015) ("[U]nder longstanding tradition, 'a *corporation* can only appear by an attorney.'" (quoting *Osborn v. Bank of U.S.*, 222 U.S. (9 Wheat.) 738, 829 (1824) (emphasis in original))). Perhaps in some instances a corporation can act as the legal representative of another. But, even if that is so, Plaintiffs do not provide any authority indicating that a parent company is considered a "legal representative" of its subsidiary merely by virtue of its role as parent, or any evidence that such is the relationship between PNS and PIS or PNSG.

*Fifth*, with respect to the "successors" of PIS, PNSG is PIS's successor by merger. In turn, PNS is the parent company of PNSG. The parent-subsidiary relationship does not allow PNS to step into PNSG's shoes, however. Corporate law has long acknowledged and respected "the separate identity of corporations and their subsidiaries," *Fed. Ins. Co. v. Fredericks*, 2015-Ohio-694, ¶ 66, 29 N.E.3d 313, 328 (Ohio Ct. App. 2015), such that parents cannot be held liable for the actions of their subsidiaries (except in limited circumstances), nor can they seek to enforce directly the rights of their subsidiaries. *See Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1205 (Del. Ch. 2010) (noting that, under Delaware corporate law, "[t]he parent corporation does not receive the right to sue as a result of the merger and cannot assert directly the right of the subsidiary"); *see also Tenn. Valley Auth. v. Exxon Nuclear Co., Inc.*, 753 F.2d 493, 497 (6th Cir. 1985) ("[U]nder ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both, and a parent corporation will not be liable for the obligations of its subsidiaries." (citing 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 43 (perm. ed., rev. vol. 1983))); *Ray v. Fifth Third Bank, N.A.*, No. 1:21-cv-

00076, 2022 WL 974341, at *5, *7 (S.D. Ohio Mar. 31, 2022). This principle holds true even where the subsidiary is wholly-owned by the parent. *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, ¶ 40, 2006-Ohio-6553, 861 N.E.2d 109, 117 (Ohio 2006).

Of course, there are some limited circumstances in which a parent can assert the rights of its subsidiary. One is where the parent and subsidiary are so intertwined that "the subsidiary acted as 'mere instrumentality or adjunct' of the parent" and thus the subsidiary's actions can be attributed to the parent. *See Masco Cabinetry Middlefield, LLC v. Cefla N. Am., Inc.*, 637 F. App'x 192, 201 (6th Cir. 2015). Another arises where the contract explicitly grants rights to both parent and subsidiary. *See, e.g.*, *Guidant Sales Corp. v. George*, No. CIV. 01-1638, 2001 WL 1491317, at *6 (D. Minn. Nov. 19, 2001). Finally, a parent can sometimes enforce the claims of a wholly-owned subsidiary through a derivative action. *See Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081 (Del. 2011); *see also id.* at 1081 & n.13 (noting that a parent can cause, by exercise of its 100% control of the subsidiary, cause the subsidiary to enforce its claim directly). None of these situations applies here: this is not a derivative action,[4] the AAA does not list PNS (or any other Presidio entities, except Presidio Holdings) as a beneficiary or enforcer of the assigned rights, and Plaintiffs have not suggested that PNSG acts as a "mere instrumentality or adjunct" of PNS.

This Court therefore concludes that PNS is not a legal representative, successor, or authorized assign of PIS, within the meaning of the AAA, nor is it otherwise identified in the AAA as a party with the power to enforce the Employment Agreements.

---

[4] And even if it was, PNSG's enforcement claim would fall short of the mark because, as mentioned previously, it never performed pursuant to the Employment Agreements since it never employed the Individual Defendants and thus cannot meet the second element of a breach of contract claim.

Finally, Plaintiffs suggest that Section 5.6 of the APA, which provides that, upon closing "[PIS] will offer, or cause its applicable Affiliate to offer, employment to" Netech employees, indicates an implicit intent for the PIS acquisition to inure to the benefit of PNS. (APA § 5.6(a), ECF No. 175-58). After all, in accordance with this provision, PNS, as an "applicable Affiliate" of PIS, employed the former Netech employees, including the Individual Defendants, for many years. (*See* Presidio MSJ II at 9, ECF No. 177) (observing that "'Affiliates' of PIS . . . would include any and all of the Plaintiffs in this case," including PIS). But the "intent" of a contract "is presumed to reside in the language [the parties] choose to use in their agreement." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (1996)); *see also Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."). Further, the clear language employed by the parties in this case indicate that the rights of Netech were assigned to PIS, and were deemed enforceable by PIS, Presidio Holdings, and by PIS's "legal representatives, successors and authorized assigns"—which do not include PNS.

Moreover, note that while the APA provision highlighted by Plaintiffs mentions the "applicable Affiliates" of PIS, into which category PNS apparently falls, there is no such mention of "applicable Affiliates" in the AAA. The Presidio entities involved in this case are sophisticated entities: this Court presumes that they have the requisite knowledge and experience to draft contracts with precision and care. The inclusion of "applicable Affiliates" in the APA and the omission of the same from the AAA suggests that PNS was contemplated in one but not the other.

In short, the Netech employment agreements assigned to PIS did not inure to the benefit of and are not enforceable by PNS.[5]  Without an enforceable contract, Plaintiffs cannot sustain their breach of contract claim.  Accordingly, the Individual Defendants' Corrected Motion for Summary Judgment (ECF No. 189) is **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 177) is **DENIED** as to Count 1.

### C.  Trade Secret Misappropriation

Proof of trade secret misappropriation under either the federal DTSA or the state law OUTSA requires similar elements.  For the DTSA, a plaintiff must show the existence of a protectable trade secret and misappropriation of the trade secret.  *See Corp. Bertec v. Sparta Software Corp.*, No. 2:19-cv-04623, 2020 WL 2112162, at *7 (S.D. Ohio May 4, 2020).  Misappropriation is defined in this context as either acquisition of a trade secret by someone "who knows or has reason to know that the trade secret was acquired by improper means," or disclosure or use of a trade secret without consent by someone who acquired it via improper means or knew or had reason to know that her knowledge of the trade secret came about via improper means or in violation of a duty to keep it secret.  *See* 18 U.S.C. § 1839(5).  The OUTSA requires a plaintiff to demonstrate: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; (3) and the unauthorized use of a trade secret.  *See Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019).

In short, to prevail on their misappropriation claims under either statute, Plaintiffs must show that they have trade secrets that PDT and the Individual Defendants have improperly

---

[5] As discussed previously, both PNSG as successor-by-merger and Presidio Holdings are contemplated as beneficiaries to the AAA.  PNSG is a party to this case, but never employed any of the Individual Defendants.  (*See also* Pls.' Resp. in Opp'n at 12, ECF No. 209) (arguing only that PNS has the right to enforce PNSG's rights as its parent, not that PNSG can enforce the employment agreements against individuals it never employed).  Presidio Holdings is not a party to this case; its rights cannot be enforced by its parent, Presidio, Inc.  *See supra.*

acquired, used, or disclosed. (*Cf.* Presidio MSJ II at ii, ECF No. 177). Plaintiffs argue that there is no genuine dispute of material fact that they have done so; PDT and the Individual Defendants argue that the opposite is true.

### 1. Existence of Trade Secrets

Broadly speaking, "trade secrets" under both the DTSA and the OUTSA refer to information that the owner "has taken reasonable measures" to keep secret and that "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); *see also* Ohio Rev. Code § 1333.61. This could include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839(3). The Ohio Supreme Court has set forth six factors to be balanced in determining when an item is a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex. rel. Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (1997) (citation omitted).

Plaintiffs argue that the 645 alleged trade secrets in this matter can largely be categorized into three groupings: documents with pricing information (including margins); documents with information about customized solutions; and pre-sales documents. (*See generally* Presidio MSJ II at 60–66, ECF No. 177). While each of these categories of documents can meet the standard for

what constitutes a trade secret, there are genuine disputes of material fact as to whether the documents in this case do so.

Pricing Documents. Many of the alleged trade secrets are pricing documents, which show the prices that PNS charges for its services and equipment and PNS's margins (*i.e.*, the profit markup that PNS applies to the equipment or service). This type of information can certainly constitute trade secret. *See Dayton Superior Corp. v. Yan*, No. 3:12-cv-00380, 2012 WL 5497804, at *8, *6–*7 (S.D. Ohio Nov. 13, 2012).

Both fact and expert witnesses have testified that pricing and margin information is not generally known or ascertainable. Quackenbush, for example, explained that he would not share quotes or margin information with third parties. (*See* Quackenbush Dep. 49:21–50:8, ECF No. 175-30). Other account executives agreed, particularly with respect to margin information, which they noted that they would never share with clients or third parties. (*See, e.g.*, Schaumleffel Dep. 138:9–15, ECF No. 175-3; Booth Dep. 39:24–25, ECF No. 175-32; Quackenbush Dep. 49:21–50:8, 52:3–5, 53:16–54:1, ECF No. 175-30). PDT's industry expert, Guy Hughes, also concurred that "a VARs [sic] cost and margin are not details that would be readily available." (Hughes Report at 6, ECF No. 175-33). This is because VARs worry that, if their competitors know their pricing information, the competitors will be able to gain insights into their business models and put together more competitive bids for the same projects. In short, a VAR's pricing and margin information is not generally known and can derive value from being secret.

But while pricing information can be valuable to competitors, it also quickly becomes stale as it is "fluid in nature" and "typically valid for [only] 30-days." (Hughes Report at 5, ECF No. 201-2; *see also* Mexicotte Report at 6, ECF No. 201-4). And stale or "obsolete information cannot form the basis for a trade secret claim because the information has no economic value." *Fox Sports*

*Net N., LLC v. Minn. Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003). But it is still possible that, though old pricing information is generally considered obsolete, a particular PNS document with old pricing information still retained some value to PNS's competitors, like PDT. A reasonable jury could certainly infer from the conduct of the Individual Defendants, who brought documents with old pricing information to PDT and subsequently accessed those documents in their new roles at PDT, that that was the case.[6] After all, why else would they intentionally download their previous client files before leaving PNS, then upload them to their PDT laptops?

On the other hand, a reasonably jury could instead credit the testimony of PDT's experts, who have reviewed the alleged trade secrets and concluded that none of them is a trade secret. This is true even for pricing documents that include margin information, which Plaintiffs assert does not go stale or obsolete as readily but remains constant for much longer than prices. Mexicotte wrote in his report that the alleged trade secrets in this case included "standard margins" that "are well known by all resellers." (Mexicotte Report at 5, 6, ECF No. 201-4; *see also* Hughes Report at 6, ECF No. 203-2).

Plaintiffs have presented testimony that pricing information is valuable and would not typically be shared with third parties and identified conduct by the Individual Defendants suggesting that the specific documents taken have value; Defendants have presented contrary testimony that the information in this case is obsolete and not trade secrets. *Cf. AtriCure Inc. v.*

---

[6] PDT argues that, to defeat its motion for summary judgment, it is not enough for Plaintiffs to put for evidence and argument that a document could be a trade secret; rather, Plaintiffs must show that the document indisputably is a trade secret. (*See* PDT Reply Br. at 1, 3, ECF No. 259) (citing *Synopsis, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 769, 773–74 (4th Cir. 2023)). While it is true that Plaintiffs bear the burden of proving their trade secrets in order to prevail, PDT must show an absence of a genuine issue of material fact as to whether Plaintiffs can carry their burden to succeed at the summary judgment stage. Thus, if there is sufficient evidence in the record that Plaintiffs could show that a document is a trade secret, the claim will survive. Moreover, the Fourth Circuit in *Synopsis* recognized that, while "evidence of independent economic value must be prove as to each item" that a plaintiff alleges is trade secret," this does "not necessarily prohibit a court . . . from discussing the independent economic value of individual trade secrets by groups." *Synopsis*, 70 F.4th at 772, 773.

*Jian Meng*, 842 F. App'x 974, 979 (6th Cir. 2021) ("Whether information constitutes a trade secret is a question of fact." (quoting *In re Rev. of Alt. Energy Rider Contained in Tariffs of Ohio Edison Co.*, 153 Ohio St.3d 289, ¶ 35, 2018-Ohio-229, 106 N.E.3d 1, 9 (Ohio 2018))). Thus, there are genuine disputes about whether the information in the pricing documents should be considered trade secret; resolving those disputes is left to a jury.

Customized Solutions. A similar analysis applies to the alleged trade secrets that describe customized solutions PNS provided to its customers, which include detailed statements of work, bills of materials, and system engineering reports. *See Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1131 (N.D. Ill. 2019) (finding that custom client solutions can constitute trade secrets). Bills of material and statements of work, for example, describe customized solutions that PNS created for its clients, often involving how a specific set of equipment (chosen based on the client's needs) will be procured, staged, and installed—arguably "the biggest value" that a VAR would provide to its client. (*See* Mexicotte Dep. 28:7:24–30:10, ECF No. 175-42). Professional services pricing documents detail PNS's methodology, the deliverables, and the costs of services. (*See* Presidio MSJ II at 64, ECF No. 177). And system engineering reports outline proposed or installed solutions designed for the customer. (*See* Schlotterer Dep. 165:21–166:6, ECF No. 175-2). These documents reflect the work that a VAR's engineers have performed or prepared for their customers, which account executives have explained they would not share with either third parties or even, in some cases, with clients. (*See* Quackenbush Dep. 53:12–54:1, ECF No. 175-30).

But, like pricing information, an engineer's work product could become stale with the passage of time. Mexicotte writes in his report that, "[i]n general, once installation happens, statements of work, (SOWs) become essentially useless to another VAR." (Mexicotte Report at 4, ECF No. 201-4). Moreover, he asserts that none of the SOWs in the alleged trade secrets

36

contains a detailed explanation of the staging and project plan, which is what Plaintiffs identified as the primary value of these documents.  (Mexicotte Dep. 30:7–15, ECF No. 175-42).

Consider the Presidio/Avita Comprehensive Proposal document, which is a BOM for the 2017 network refresh project for Avita.  This document has information about PNS's pricing and the details of the network services it provided to Avita, which Plaintiffs assert is economically valuable to competitors.  Schaumleffel casts doubt on that assertion, noting that the document was obsolete and had "no weight" (as did Ely).  (Schaumleffel Dep. 130:3, ECF No. 175-3).  But he also brought the document with him to PDT and shared it for a reason: he thought that the document would serve as a useful "starting point" for the PDT team in preparing to bid for the new network refresh project at Avita and, specifically, would help Benham get "up to speed."  (*Id.* 127:1–5, 130:1–3).  A reasonable jury could certainly conclude from his testimony and his conduct that, despite his protestations that the document was obsolete, he clearly believed it retained some value.

There is a genuine dispute of material fact as to whether this document, and the other customized solutions documents brought by former PNS employees to PDT, derives independent economic value from not being generally known.

<u>Presales Documents</u>.  The third category of alleged trade secrets described by Plaintiffs includes presales documents, which, broadly speaking, are internal documents prepared by VARs in anticipation of bidding on client projects.  Presales documents range from pricing quotes to wireless survey reports.  (*See* Presidio MSJ II at 65, ECF No. 177).  A VAR's knowledge of its competitors' presales documents would enable it to provide more competitive bids on the same project, as it would know in advance "what is happening in that particular deal."  (Mexicotte Dep.

78:23–25, ECF No. 175-42; *see also id.* 76:19–24). One of PDT's experts acknowledged that presales documents can be trade secrets. (*Id.* 150:4–12).

But, while Mexicotte explained that wireless surveys at the presales stage can be trade secret, Faber, the engineer who performed these surveys at both PNS and PDT, claimed that the surveys are not confidential and are frequently shared with other contractors (*i.e.*, with third parties). (*See id.* 105:1–7; Faber Dep. 139:9–22, ECF No. 201-19). Plaintiffs' assertion that, because Faber's "testimony is contrary to what PDT's own expert said . . . there is no issue of fact" as to whether these presales survey reports are trade secrets, misunderstands the Rule 56 standard. Faber's testimony does create an issue of fact; if the wireless survey reports are regularly shared with third parties, then that severely undermines the assertion that the reports derive independent economic value from not being known. That his testimony is contradicted by Mexicotte's does not indicate the absence of a dispute, but rather the existence of a dispute.

Other Documents. Finally, there are some alleged trade secrets that do not fall neatly into the three categories—pricing documents, custom solutions documents, and presales documents— discussed above. Such files include: three audio files of customer greeting recordings for Premier Bank; Python files with only metadata; and a presentation originally created by Cisco. (*See* PDT Suppl. Ex. 1, nos. 7–9, 10–24, ECF No. 238-1; PDT Suppl. Ex. 2, nos. 1–3, 36, ECF No. 238-2). Plaintiffs do not explain why or how such documents derive independent economic value from not being generally known. (*See generally* Pls.' Reply Br. at 28–32, ECF No. 266). Moreover, Plaintiffs have not presented evidence suggesting that any alleged trade secret outside the previous three categories is a trade secret. This Court therefore finds that these documents are not trade secrets.

Before moving on, this Court addresses objections that Defendants have raised about two specific subsets of the 645 alleged trade secrets: (1) documents in the possession of public entities; and (2) documents shared with clients.  Defendants suggest that documents in the former category are not trade secret because they are "readily ascertainable" via Freedom of Information Acts ("FOIAs"), and that documents in the latter are not because disclosure of information to a client or third party renders that information no longer trade secret.

A substantial number of PNS's clients are public school districts and community colleges; over 100 of the alleged trade secrets at issue in this case are documents in the possession of public entities in Illinois, Michigan, and Ohio (relating to bids and work for projects with those entities), which have all passed state law versions of FOIA.  (*See* PDT MSJ at 17, ECF No. 171).  Documents in the possession of public entities are considered "presumptively public records" under FOIA, *see* Mich. Comp. Laws § 15.233; *see also State ex rel. Penland v. Ohio Dep't of Rehab. & Corr.*, 158 Ohio St.3d 15, ¶ 9, 2019-Ohio-4130, 139 N.E.3d 862, 865 (Ohio 2019), and once "information is in the public domain and the element of secrecy is gone, the trade secret is extinguished." *Rogers Indus. Prods. Inc. v. HF Rubber Mach., Inc.*, 188 Ohio App.3d 570, ¶ 15, 2010-Ohio-3388, 936 N.E.2d 122, 126 (Ohio Ct. App. 2010) (quoting *Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995)).

Public disclosure of records through FOIA requests is not, however, automatic.  The Ohio FOIA, for example, includes a carve-out for trade secrets.  *See* OHIO REV. CODE § 149.43; *see also State ex rel. Am. Ctr. for Econ. Equality v. Jackson*, 2015-Ohio-4981, ¶ 48, 53 N.E.3d 788, 799 (Ohio Ct. App. 2015).  The statute allows for documents disclosed to requestors to be redacted to protect trade secrets or confidential information.  *See State ex rel. Lucas Cnty. Bd. of Comm'rs v. Ohio Env't Prot. Agency*, 724 N.E.2d 411, 420 (Ohio 2000).  Illinois law includes a similar

provision.  *See* 5 ILL. COMP. STAT. 140 § 7(1)(g).  Plaintiffs have put forward sufficient evidence to establish a dispute as to whether the documents possessed by Ohio public entities contain trade secrets and thus whether the documents, if disclosed pursuant to a FOIA request, would be heavily redacted—in which case, the alleged trade secret information contained therein is not readily ascertainable simply because Ohio state law has a FOIA provision.

By contrast, the corresponding carve-out for the Michigan FOIA is far narrower: it exempts trade secrets from disclosure only when "authorized by the chief administrative officer of the public body or by an elected official."  MICH. COMP. LAWS § 15.243(1)(f).  Here, Plaintiffs have not met their burden of providing evidence upon which a reasonable jury could conclude that the alleged trade secrets in the hands of Michigan public schools meet this requirement; there is no evidence of any authorization by the chief administrative officer or an elected official that PNS documents will be kept confidential in the face of a FOIA request.  In fact, there is evidence that the opposite is true: many of the alleged trade secrets are publicly available.  Documents provided to the Ionia Public Schools are publicly accessible on a Google Drive;[7] documents provided to the Regional Education Media Center ("REMC") Association of Michigan, through which PNS sells IT hardware to Michigan public school districts, are posted online without any password-protection;[8] and documents provided to the Troy Public Schools were disclosed promptly in response to a FOIA request.  (*See* PDT MSJ at 20 & n.5, ECF No. 171; PDT Resp. in Opp'n at 7 & n.1, ECF No. 201).  The fact that account executives at VAR do not regularly submit FOIA requests is of no consequence.  The issue is whether the documents are "readily ascertainable"—

---

[7] An archived version of the folder is available at: https://perma.cc/G3NK-FHEJ.
[8] The documents include PNS's prices, which can be found at https://perma.cc/3VSP-XW6D and at https://perma.cc/H29N-6ZJQ; PNS's bids can be found at https://perma.cc/CS5E-CHZA.  All three correspond to publicly accessible websites.

which they are—and not whether they have been regularly accessed.  Accordingly, summary judgment is warranted as to these documents as they are readily ascertainable by proper means.

Another subset of the alleged trade secrets is documents provided by PNS account executives and engineers to their clients.  Defendants argue that such documents cannot be trade secrets, because "[d]isclosure to potential or actual customers, absent a confidentiality agreement or understanding, will destroy any protection of that information as a trade secret."  *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 411 (6th Cir. 2013) (citation omitted).

In the first instance, it is not clear that this non-precedential opinion from the Sixth Circuit is dispositive.  Trial courts confronted with the same issue, including this Court, have frequently found that information sent to customers does not automatically lose trade secret protection simply by virtue of that transmission.  *See, e.g.*, *H&H Indus., Inc. v. Miller*, No. 2:13-cv-00907, 2013 WL 6858760, at *7 (S.D. Ohio Dec. 27, 2013); *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 713 (N.D. Ill. 2009); *Mickey's Linen v. Fischer*, Case No. 17 C 2154, 2017 WL 3970593, at *9–*10 (N.D. Ill. Sept. 8, 2017).  And, as a general matter, that makes sense: information that a VAR might be willing to share with its customers, pursuant to the client relationship, may still retain independent economic value by virtue of not being known to or ascertainable by the VAR's competitors or other third parties.

More importantly, there is some disagreement as to whether the PNS pricing documents, statements of work, and purchase orders were sent to clients pursuant to confidentiality agreements or, at minimum, a confidentiality understanding.  *See Allied Erecting & Dismantling Co.*, 511 F. App'x at 411.  The pricing quotes, for example, include terms and conditions, one of which is a confidentiality provision that requires the parties to protect the information contained within as

41

confidential and proprietary. (*See, e.g.*, Pls.' Opp'n Ex. 53, ECF No. 203-53; Pls.' Opp'n Ex. 57, ECF No. 203-57; Pls.' Opp'n Ex. 58, ECF No. 203-58). Documents that the Individual Defendants took with them to PDT were marked "confidential and proprietary," and documents "marked confidential[] are entitled to a presumption that they are trade secrets under Ohio law." *Basicomputer Corp. v. Scott*, 791 F. Supp. 1280, 1291 (N.D. Ohio 1991). *But see Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1303 n.23 (E.D.N.C. 1996) (holding that a "confidential" label on a document is not enough to render it so). Testimony also suggests that clients understood that sharing customer pricing and quotes was not standard practice; Sutherland, for example, stated that none of his customers ever told him what competitors were charging or offering on deals, and would at most tell him if he needed to lower his pricing. (Sutherland Dep. 23:2–11, 54:16–19, 55:5–56:3, ECF No. 175-31).

Of course, the clients readily and frequently sent PNS documents to PDT. This could cut in favor of either side. It could indicate, for example, that the confidentiality provision in the terms and conditions meant little and did not truly reflect a "confidentiality agreement" whose terms PNS and its clients had mutually agreed to; or, it could indicate that PDT employees had induced the clients to breach the provision, contrary to their normal practice of not sharing one VAR's pricing information with other VARs.[9] Defendants, in short, have not established beyond dispute that PNS sent documents to its clients in the absence of a confidentiality agreement.

___

[9] It is worth noting briefly that there also appears to be a genuine dispute about whether Plaintiffs took "reasonable measures" to keep the documents confidential. Courts have often considered "[e]fforts to restrict physical access to trade secrets," to impose confidentiality agreements, and to protect digital records "through password-based access restrictions" to be sufficiently reasonable. *See, e.g.*, *Dayton Superior Corp.*, 2012 WL 5497804, at *6. PNS required all work to be conducted on password-protected computers and VPNs, and monitored compliance with these requirements. But PNS also relied on outdated confidentiality provisions for its employees, *see supra*, and on policies in an employee handbook that are not contractual in nature, apparently enforced its cloud storage policies inconsistently, and in at least one case took months to shut off a former employee's access to its cloud systems. (*See* Korreck Dep. 112:15–18, ECF No. 171-8; Raglow Dep. 82:19-83:25, ECF No. 171-22; Martin Dep. 69:23–70:2, ECF

For the foregoing reasons, this Court concludes that there is a genuine dispute of material fact as to whether the pricing, customized solutions, and presales documents derive independent economic value from not being generally known and therefore are trade secrets. But because the subset of these documents that were shared with Michigan public schools are "readily ascertainable" under the Michigan FOIA, summary judgment is warranted in favor of Defendants on those alleged trade secrets. Summary judgment is also warranted in favor of Defendants on documents that do not contain pricing, customized solution, or presales information, including *inter alia* the audio files of customer greeting messages, the Python metadata, and the Cisco presentation; these files are not trade secrets.

### 2. *Misappropriation of Trade Secrets*

Misappropriation of trade secrets typically entails either the improper acquisition or the improper disclosure or use of trade secrets. *See Prominence Advisors, Inc. v. Dalton*, No. 17 C 04369, 2017 WL 6988661, at *3 (N.D. Ill. Dec. 18, 2017). This Court first considers whether the Individual Defendants have engaged in misappropriation, before discussing whether PDT has done so, as the latter issue turns in large part on the answer to the former.

### a. *The Individual Defendants*

When the Individual Defendants left PNS, undisputed record evidence shows that they took with them tens of thousands of PNS documents. As detailed *supra*, Ely backed up his entire PNS laptop, with more than 80,000 documents, to an external personal hard drive, Martin moved documents related to The Andersons and Premier Bank from his PNS laptop to his wife's USB drive, and Schaumleffel downloaded a couple hundred PNS files to a USB drive and emailed

---

No. 87-15). Whether these steps are "reasonable" is a fact-specific inquiry subject to dispute. *See also Novak v. Farneman*, No. 2:10-cv-00768, 2010 WL 4643002, at *5 (S.D. Ohio Nov. 9, 2010).

himself spreadsheets with PNS pricing and margin information.  Each then uploaded those documents to their PDT devices and the company-wide PDT OneDrive and personally accessed a substantial number of the documents in the course of their PDT work.

It is clear that Ely, Martin, and Schaumleffel brought over PNS documents to PDT and shared and accessed those documents as PDT employees.  The issue then is whether the transfer of PNS documents by Ely, Martin, and Schaumleffel to PDT and the later use of those documents at PDT was improper.  As an initial matter, these actions could not have violated the Employment Agreements they originally signed with Netech, given that this Court has concluded that those agreements were not assigned to PNS.  The Individual Defendants had also agreed, when they joined PNS, to abide by the provisions of PNS's Employee Handbook, Cloud Services Policy, and, later when they left, the PNS Employee Exit Guide.  These documents, the parties appear to agree, are not binding contracts.  But they are nevertheless policies that created obligations for how the Individual Defendants handled PNS documents; there is no suggestion that the Individual Defendants were free to flout the rules in the Employee Handbook without impunity.  Among other restrictions, the Individual Defendants were not permitted to store PNS information on their personal cloud accounts or devices and were required to return all documents and information containing or relating to PNS business upon departure.  Ely, Martin, and Schaumleffel, however, did so: they stored PNS files on their personal devices and then failed to return them to PNS when leaving the company.

A second issue is whether the files they took were PNS files at all.  They assert repeatedly that the files belonged to the clients; this is the same argument Schlotterer makes with respect to the zip file he sent to Premier Bank, *see infra*.  (*See* ID MSJ at 32–33, ECF No. 189).  But there is little explanation for why these files—which constitute work that the Individual Defendants had

44

done for the clients as PNS employees—are considered client property and not PNS property. And even if there is a convincing explanation, the PNS Employee Handbook that the Individual Defendants acknowledged and agreed to notes that all work done by PNS employees belongs to PNS. (*See* June 2022 Korreck Decl. Ex. A, ECF No. 87-5).

Once they joined PDT, evidence in the record shows that Ely, Martin, and Schaumleffel repeatedly accessed the documents that they had brought over to PDT. To be sure, there is some dispute about the utility of the documents. Ely, for example, testified that the documents he had downloaded were useless by the time he had joined at PDT, even though he reviewed them occasionally to refresh his memory. Schaumleffel sent around the Presidio/Avita Comprehensive Proposal document for his co-worker Benham to review and rely on its contents in helping prepare a bid, but also claims that the document was old and carried no weight.

Likewise, Schlotterer admitted to using the PNS files that he had sent to Premier Bank before he left PNS and Premier Bank had sent back to him once he joined PDT. (*See also* Schlotterer Dep. 188:25–190:10, ECF No. 175-2). The key question is whether he acquired those files improperly; he did not violate the PNS cloud use or exit guide policies, since he did not download the files to a personal device and retain them after leaving. And while Plaintiffs claim that Schlotterer "put in motion a process whereby Premier Bank" sent him back the file, the portion of Schlotterer's deposition Plaintiffs cite for this assertion does not support the implication that he induced Premier Bank into assisting him with a grand scheme to misappropriate PNS files. (*See* Presidio MSJ II at 21, ECF No. 177) (citing Schlotterer Dep. 137:10–23, ECF No. 175-2). But other evidence in this case, including emails Martin sent to his former PNS clients asking them to send PNS quotes to his PDT email address and testimony that clients do not typically send VARs information from their competitors, provides some circumstantial evidence upon which a juror

45

could conclude that the process by which Schlotterer sent Premier Bank the zip file and Premier Bank sent it back once he joined PDT was unusual and possibly improper.

In short, a reasonable jury could certainly conclude from Ely, Martin, and Schaumleffel's retention and transfer of PNS documents to PDT, in violation of PNS policies, from the unusual sequence of events leading to Schlotterer's access to the Premier Bank files, and from the Individual Defendants' later use of these documents that they engaged in misappropriation.

<em>b.</em>    <em>PDT</em>

PDT argues that, even if the Individual Defendants engaged in misappropriation, it cannot be held liable for their actions and the actions of other former PNS employees. It also argues that, in the absence of direct evidence that PDT directed the improper acquisition of PNS files, Plaintiffs must show that PDT knew or had reason to know that the alleged trade secrets had been acquired improperly by its employees to prove misappropriation by PDT—but that Plaintiffs cannot meet that challenge. *See* 18 U.S.C. § 1839(5)(A).

To support its position, PDT relies heavily on its remediation efforts, arguing in effect that, because Teipel advised new hires not to bring information from prior employers, held an all-hands meeting to reiterate that instruction after Plaintiffs filed suit, and hired Axis to quarantine devices and remove PNS files, it had actually gone to "great lengths to *avoid* acquiring . . . any information that could arguably be a trade secret." (*See generally* PDT MSJ at 24–26, ECF No. 171) (emphasis in original).

Plenty of evidence in the record, however, undermines the rosy picture that PDT paints of its own actions. *First*, PDT's claim that it proactively sought to prevent misappropriation, by having Teipel tell incoming employees not to bring PNS files, is undermined by testimony from employees that they never received such an instruction.

46

*Second*, even after discovering its employees possessed PNS files in October 2021 (when Schlotterer discussed his attempts to upload PNS files to the PDT OneDrive with Lochkovic and McPherson), PDT did not immediately take action. (*See* Schlotterer Dep. 179:2–180:2, ECF No. 175-2). Nor did it initiate remediation in the wake of the November 30, 2021, call during which Schaumleffel circulated the Presidio/Avita Comprehensive Proposal document; in fact, he continued to work on the Avita account for PDT after that incident. Instead, PDT sounded the alarms only after this suit was initiated by Plaintiffs. In short, PDT was aware that its employees possessed legacy PNS files for nearly two months before it began addressing potential misappropriation.

*Third*, the remediation itself was limited—the PNS files were left on devices and the company-wide OneDrive for substantial periods of time, and Teipel expressed no concern that his employees continued to possess such files. PDT did not conduct any further investigations into the employees who were in possession of PDT files, allowed employees to continue using the same laptops on which PNS files had been stored, did not remediate the OneDrive to which files had been uploaded (and to which all employees had access), and conducted a forensic analysis of only a limited subset of devices. (*See* May 2022 Teipel Dep. 77:2–19, 80:15–81:1, ECF No. 175-59; Fannon Dep. 70:22–72:6, ECF No. 203-4). As an example, PDT disclosed in July 2022 that Faber had possession of and used PNS documents, but then proceeded to allow him to retain possession of his PDT laptop without restrictions until February 2023. (*See* Pls.' Resp. in Opp'n at 37–38, ECF No. 207).

In short, there is plenty of evidence in the record to suggest that, even after PDT was aware its employees possessed files originating from PNS, it attempted to prevent the use of those files in a slow, haphazard, and reluctant manner, and only after it had been sued in this Court. That

multiple VPs at the company were aware that employees were bringing and sharing PNS files also supports the inference that PDT had reason to know about an improperly-acquired influx of confidential competitor information.

The same reasoning compels the conclusion that PDT has not shown beyond genuine dispute that it cannot be held liable for trade secrets found on the personal devices of its employees. It cites no caselaw in support of this proposition. And, to the contrary, some courts have found that misappropriation can be imputed to an entity that has accepted the benefits of the alleged misappropriation. *See Travel Leaders Leisure Grp., LLC v. Cruise & Travel Experts, Inc.*, No. 19-cv-02871, 2020 WL 4604534, at *14 (D. Minn. Aug. 11, 2020). Plaintiffs here argue, and PDT has not provided evidence refuting, that PDT garnered the benefits of the trade secrets that its employees misappropriated—and therefore that PDT can be held liable for misappropriation on that basis even for documents that it did not directly possess. (*See* Pls.' Resp. in Opp'n at 66–67, ECF No. 207). This Court concurs: a corporation cannot escape liability for misappropriation simply because it did not directly engage in the possession or misuse of trade secrets if it has authorized, explicitly or tacitly, the improper actions of its employees.

In short, summary judgment is not warranted as to the trade secret claims against either the Individual Defendants or PDT based on the misappropriation element, because there are genuine disputes of material fact about whether the acquisition of files by the Individual Defendants was improper and whether the alleged improper acquisition and use were known, reasonably known, or attributable to PDT.

### 3. *Damages*

There is one final basis on which PDT and the Individual Defendants seek summary judgment on the trade secrets claims: damages. A plaintiff asserting trade secret misappropriation

may prevail only upon a showing of damages, either in the form of lost profits or unjust enrichment, "caused by" the alleged misappropriation. *See* 18 U.S.C. § 1836(3)(B); Ohio Rev. Code § 1333.61. PDT and the Individual Defendants argue that Plaintiffs' damages claims are too speculative to be sustained; the Individual Defendants also argue that Plaintiffs have failed to disclose adequately the computation of damages for each Individual Defendant. Both arguments are unavailing.

First, PDT and the Individual Defendants assert that Plaintiffs' damages expert, Brian Daniel, has put forward a damages calculation based on "simplistic extrapolation and childish arithmetic," by "improperly assum[ing] that any opportunities that PDT won would have otherwise gone to Presidio" rather than "differentiat[ing] the profits that Presidio is losing due to legitimate competition versus profits lost due to alleged trade secret misappropriation." (PDT MSJ at 27, 28, ECF No. 171) (quoting *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992)). And that, they argue, is too speculative to be sustained.

This critique appears to misunderstand the prohibition against damages claims "based upon speculation or conjecture." *Allied Erecting & Dismantling Co.*, 511 F. App'x at 401. Damages are considered "too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain." *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 641 (6th Cir. 2020) (citation omitted). Thus, a plaintiff need only prove the amount of damages that she has suffered to a "reasonable certainty." *Id.* The question this Court must answer is simply if there is "substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." *Grantham & Mann, Inc. v. Am. Safety Prod., Inc.*, 831 F.2d 596, 601–02 (6th Cir. 1987) (citations omitted). In other words,

49

whether Daniels' calculation has applied the correct methodology or properly distinguished legitimate from illegitimate damages is not relevant at this time.

Instead, what matters is whether Plaintiffs have demonstrated with reasonable certainty that they have suffered damages; the precise amount of damages is left for a jury to determine. *See Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007). Here, Plaintiffs have produced some evidence suggesting that the Individual Defendants and other PDT employees misappropriated PNS's trade secrets, and that PNS then lost out to PDT on opportunities with the same clients whose PNS files had been misappropriated. To be sure, this evidence is disputed. There is some indication that PNS lost clients because PDT undercut PNS on price, but also some indication that PNS lost clients due to mistakes of their own doing. (*See* PDT Reply Br. at 10, ECF No. 259). But there is at minimum a dispute here as to whether the alleged misappropriation caused the loss of business for PNS. *See, e.g.*, *Guide Techs. LLC v. Killeen*, No. 1:09-cv-00366, 2011 WL 13202871, at *16 (S.D. Ohio Mar. 21, 2011). Therefore, this Court concludes that the existence of damages associated with the trade secrets claims is not speculative.

Second, the Individual Defendants argue that Plaintiffs have failed to disclose their damages computations as to each of the Individual Defendants in violation of Rule 26, and that that failure is fatal to the misappropriation claim. Parties are required to, "without awaiting a discovery request, provide . . . a computation of each category of damages claimed by the disclosing party." FED. R. CIV. P. 26(a)(1)(A)(iii); *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295–96 (2d Cir. 2006) (noting that Rule 26 requires the disclosure of "both a calculation of damages and the documents supporting that calculation"). Here, Daniel, Plaintiffs' damages expert, did not analyze damages for each specific Individual Defendant in his report but instead

calculated damages by customers lost.  (*See* Daniel Dep. 232:18–233:17, ECF No. 203-5; *see also* Daniel Report, ECF No. 175-48).

Nevertheless, this Court hesitates to apply the heavy sanction requested—exclusion of all damages evidence against the Individual Defendants and, concurrently, dismissal of the trade secret misappropriation claims against them—for two reasons.  (*See* ID MSJ at 37–38, ECF No. 189).  On the merits, the omission appears to be harmless, given that Daniel set out in his report the actual lost revenue associated with the client projects that the Individual Defendants' alleged misappropriation is alleged to have caused and listed the Individual Defendant associated with each project; he also explained the methodology he used to calculate lost profit.  (*See, e.g.*, Daniel Report ¶¶ 81–87, 91–93, 118, ECF No. 175-48).  The damages for each Individual Defendant can be inferred directly from that information, by summing the calculated losses associated with each client with whom an Individual Defendant worked.  PDT's damages expert, Stephen Buffo, likewise provided a rebuttal calculation of the damages associated with each client based on Daniel's methodology and explanation.  (*See* Buffo Report Ex. E, ECF No. 203-7).  While Daniel's failure to calculate explicitly the damages for each Individual Defendant is certainly confusing to this Court, the detailing of his methodology and the inclusion in his report of specific lost revenues associated with each individual client project mitigate the harm of that failure.  *See Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co., Ltd.*, 993 F.3d 1299, 1308 (11th Cir. 2021) (affirming exclusion where plaintiff "never specified" methodology and the "failure to disclose hampered [defendant's] damages expert from preparing his analysis before trial" (citation omitted)).

Moreover, even if there was some degree of harm resulting from Daniel's omission, a sanction of lesser severity than exclusion of his report would likely be warranted.  The Individual Defendants assume that exclusion is an "automatic" remedy for a Rule 26 violation.  (*See* ID MSJ

at 37, ECF No. 189) (collecting cases) . That may be the law in the Eleventh Circuit, whose cases the Individual Defendants cite, but it is not in the Sixth Circuit, where "district court[s] [have] discretion to impose lesser sanctions even for violations that are unjustified and not harmless." *Circuitronix*, 993 F.3d at 1308 (collecting cases).

Additionally, the Individual Defendants' decision to raise this concern on the merits in their summary judgment motion is peculiar. There have been a bevy of motions filed prior to summary judgment in this case alleging violations of Rule 26 and requesting sanctions pursuant to Rule 37. *See supra* Part IV.A.3. This request could have been made in such a motion, or been the subject of a motion to compel. Asking for sanctions for a discovery violation in a summary judgment brief "suggest[s] 'a little bit of gamesmanship and gotcha.'" *Vital Pharms., Inc. v. Monster Energy Co.*, No. 21-13264, 2022 WL 3083273, at *2 (11th Cir. Aug. 3, 2022).

This Court concludes that there is a genuine dispute as to the existence of damages; summary judgment is not warranted in favor of the Individual Defendants or PDT on account of the damages being too speculative. And as there are also genuine disputes of material fact about the existence, improper acquisition, and use of trade secrets, all motions for summary judgment on the trade secrets claims are **DENIED** except as to: (1) files in the possession of Michigan public entities; and (2) files that do not contain pricing information, information about customized solutions, and presales documents. Summary judgment is **GRANTED** in favor of PDT and the Individual Defendants for those two subsets of the alleged trade secrets.

### D.     Trademark Infringement

PDT moves for summary judgment on Plaintiffs' trademark infringement claims, which are based on: (1) Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) Section 43(a) of the Lanham Act, 15 U.S.C. § 1125; and (3) the ODTPA. As the same analysis applies for Section 43(a) as for

52

the ODTPA, this Court considers those claims together.  *See Max Rack, Inc. v. Core Health & Fitness, LLC*, No. 2:16-cv-01015, 2019 WL 4451698, at *7 (S.D. Ohio Sept. 17, 2019).

### 1.  *Section 32 of the Lanham Act (Count IV)*

As an initial matter, Section 32 of the Lanham Act applies only to registered trademarks. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 858 (1982)); *see also Armada Oil & Gas Co. v. Eppco, Inc.*, No. 06-cv-10269, 2007 WL 2713738, at *2 (E.D. Mich. Sept. 17, 2007) ("Generally, a claim of trademark infringement must be brought by the 'registrant,' that is, the owner of the trademark."). Plaintiffs do not dispute that they have not registered "Netech," which they allege PDT has infringed, as a trademark.  *See also Trademark Electronic Search System (TESS)*, U.S. PATENT AND TRADEMARK OFF., https://tmsearch.uspto.gov/bin/gate.exe?f=tess&state=4801:n6dn3w.1.1.

As a Section 32 claim can only be brought by the registrant of a trademark and Plaintiffs have not registered Netech as a trademark, PDT is **GRANTED** summary judgment as to this claim.

### 2.  *Section 43(a) of the Lanham Act and the ODTPA (Counts V and VI)*

Section 43(a) of the Lanham Act "creates a federal cause of action for trademark infringement." *Matal v. Tam*, 582 U.S. 218, 225 (2017) (citing *Two Pesos*, 505 U.S. at 768).  A plaintiff asserting trademark infringement must show: "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'"  *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (quoting *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007)).

Regarding the first element, unlike claims brought pursuant to Section 32, a Section 43(a) claim can be sustained "even if a trademark is not federally registered."  *Matal*, 582 U.S. at 225

(citing *Two Pesos*, 505 U.S. at 768). It is undisputed that Plaintiffs own the Netech name and all of the goodwill associated with that name, even though it did not register the name as a trademark. (*See* Pls.' Resp. in Opp'n at 71–72, ECF No. 207; PDT Reply Br. at 11, ECF No. 259). Nor do the parties discuss at length whether the PDT has used the Netech name in commerce without authorization.

Instead, the core of PDT's contentions in favor of summary judgment is that there is no likelihood of consumer confusion in *how* it has used the Netech name. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) ("The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."). As a threshold matter, this Court must evaluate whether PDT has "us[ed] the challenged mark in a way that identifies the source of their goods." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) (quoting *Interactive Prods. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 695 (6th Cir. 2003)). This is because, if PDT has not done so, "then the mark is being used in a non-trademark way and trademark infringement laws, along with the eight-factor analysis, do not even apply." *Id.* (internal quotation marks and citation omitted). But if PDT has used the mark in a "trademark way," this Court must then weigh eight factors, *see infra*, to determine whether a likelihood of confusion exists.

The key question here is whether PDT's use of the "Netech" mark was simply descriptive—*i.e.*, explaining the background history of PDT, its personnel, and their experience—or if it veered into creating a misleading association between PDT's services and Netech. *See id.*; *Dow Corning v. Jie Xiao*, No. 11-10008, 2011 WL 2015517, at *7 (E.D. Mich. May 20, 2011). One of the examples Plaintiffs point to is the background section on PDT's website, which noted

that "[t]he Engen family has founded several successful business ventures, including most notably, a Value Added Reseller formerly known as Netech Corporation.  Now, they are returning to the tech industry . . . ."  But this is simply an (accurate) description of the history of the company. PDT is free to take advantage of the individual reputations of its founders and owners to compete with PNS; the blurb gives no indication to the public that the products offered by the Engens' new venture, which it makes clear is distinct from Netech, are produced by or associated with Netech. *See Madrigal Audio Labs. v. Cello, Ltd.*, 799 F.2d 814, 823–24 (2d Cir. 1986).

Other examples are not so clear, however.  Notably, Schaumleffel sent emails to prospective clients referring to PDT as "the reboot of Netech" or as "Netech 2.0."  (*See* Pls.' Opp'n Ex. 16, ECF No. 203-16; Pls.' Opp'n Ex. 17, ECF No. 203-17).  Such statements arguably cross the line into relying impermissibly on "the reputation of [Netech] . . . as a trade name" and associating PDT's products as tied in some direct fashion to Netech, rather than being simply descriptive.  *See Cello*, 799 F.2d at 823.  They have the potential to create the impression that PDT is an extension, a continuation, or a spin-off of Netech (and thus the Presidio entities), rather than a wholly distinct company.

PDT suggests that a recipient would not be confused, because Schaumleffel also added that the "owners of Netech started PDT in the past year" in one email and that the "former owners of Netech" started PDT in the other.  (*See* PDT Reply Br. at 13, ECF No. 259).  But the first simply reinforces the conclusion that he used Netech in a trademark way: the clear implication from the line, "[t]he owners of Netech founded PDT," is that PDT is associated directly with Netech as either partner companies or as parent and subsidiary.  It even appears to state explicitly that PDT's founders are the current owners of Netech—*i.e.*, the Presidio entities.  To be sure, the other email, in which Schaumleffel wrote that "the former owners of Netech have come back around" to start

PDT is somewhat less problematic. It draws a distinction between the founders of PDT and the present owners of Netech, at least. But it is still confusing. There is some indication that PDT is distinct from Netech and some that it is not; there is, in other words, a dispute as to whether that email used the Netech name in a trademark way. Because at least one PDT email clearly uses Netech in a trademark way and at least one arguably does, PDT's argument that "there is no evidence that PDT or its employees used 'Netech' in a way that would suggest affiliation with Presidio" falls short.

Having established that a reasonable jury could find that PDT used the Netech name in a trademark way, this Court must next consider "whether consumers are likely to be confused about the source of a mark." *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264 (6th Cir. 2021). The analysis involves eight factors:

> (1) Strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines or services.

*Id.* (citing *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016)). This inquiry involves both "factual components (e.g., what evidence of confusion has been shown?) and legal components (e.g., what counts as cognizable confusion?)." *Sterling Jewelers, Inc. v. Artistry Ltd.*, 896 F.3d 752, 755 (6th Cir. 2018). The Court discusses the most relevant of the factors below:

Strength of the Mark. The strength of the mark" factor "focuses on the distinctiveness of a mark and its recognition among the public." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002) (citing *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). The parties do not discuss or dispute the distinctiveness of the Netech name; this Court, finding only one other company in an unrelated industry with that name,

concludes that the mark is highly distinctive. *Cf. Daddy's Junky Music Stores*, 109 F.3d at 280 (noting that marks are typically placed "into one of four categories: generic, descriptive, suggestive, and fanciful or arbitrary," which "constitute a spectrum of increasing strength").

But even a distinctive mark is "not a strong mark . . . if it does not achieve broad public recognition" in its relevant market. *Therma-Scan, Inc.*, 295 F.3d at 631 (citation omitted). The evidence provided by the parties in favor of and against the proposition that Netech has achieved broad public recognition is circumstantial at best, and certainly not overwhelming or decisive. Neither party offers survey or other evidence on the subject. *See Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 430 (6th Cir. 2017). PNS has occasionally used the "Netech" mark in commerce but its efforts do not appear extensive and it does not use the "Netech" mark in isolation. (*See* Pls.' Resp. in Opp'n at 72, ECF No. 207) (collecting examples). PDT's reliance on the reputation of the Netech name in its own website blurb is suggestive that the name does enjoy a strong reputation in the relevant industry. This Court therefore finds the "strength of the mark" factor to be disputed, as both sides have put forward some evidence in support of their respective positions.

Evidence of Actual Confusion. There are a handful of emails in the record where clients express confusion to PDT account executives about whether Presidio's name has changed to PDT or whether PDT is associated with Presidio. (*See* Pls.' Resp. in Opp'n at 76, ECF No. 207) (collecting examples). PDT argues that any confusion about the relationship between itself and PNS "resulted from the departure of former Presidio employees for PDT, not because of the use of any mark." (PDT Reply Br. at 15, ECF No. 259). It provides no support or evidence for this assertion, however. The true cause of the confusion is not made clear by the evidence that the parties have presented; it may be attributable to PDT's proposed explanation or to the fact that

57

PDT account executives had repeatedly linked PDT with Netech in emails to clients.  Which way this factor cuts is disputed.

Marketing Channels.  This factor "compare[s] both how the parties market their products and their main customers.  The more channels and buyers overlap, the greater the likelihood that relevant customers will confuse the sources of the parties' products.  The reverse is true too." *Kibler*, 843 F.3d at 1079 (internal citation omitted); *see also AWGI, LLC*, 998 F.3d at 267 ("Less likelihood of confusion exists where: (1) the goods are sold through different avenues; (2) the parties have different customers; and (3) they market their goods or services in different ways." (internal quotation marks and citation omitted)).  Here, PNS and PDT typically market and sell their products through the same channels (*i.e.*, by direct solicitation communications) and to the same customers; PDT has used the Netech name, which PNS occasionally includes on its quotes, in soliciting customers.  (*See, e.g.*, Pls.' Opp'n Ex. 69, ECF No. 203-69; Pls.' Opp'n Ex. 77, ECF No. 203-77).  On the other hand, the fact that both companies typically rely on "direct contacts targeted at specific consumers where the sender has been clearly identified" suggests a lesser likelihood of confusion.  *Dow Corning Corp.*, 2011 WL 2015517, at *8.  This factor is neutral.

Likely Degree of Purchaser Care.  While PDT suggests that customers in the IT industry are highly attentive and careful, which generally "diminishes the likelihood of confusion," *Progressive Distrib. Servs., Inc.*, 856 F.3d at 435 (quoting *Therma-Scan*, 295 F.3d at 638), evidence in the record suggests at least some degree of confusion.  In the emails noted above, clients expressed confusion about whether they were communicating with PDT or PNS employees, sometimes after numerous back-and-forth emails, undermining the assertion that these clients are paying close attention.  Moreover, a high degree of purchaser care may be insufficient to "reduce the likelihood of confusion [where] both parties use the same mark."  *AWGI, LLC*, 998 F.3d at

58

267–68. Both the degree of purchaser care and the degree to which that care reduces the likelihood of confusion in this case are disputed.

Intent in Selecting the Mark. The "intent" factor considers whether the defendant intended to benefit from the use of the other's mark. *See id.* at 268. The repeated references to Netech by PDT and its employees suggest at least the inference that they intended to leverage the reputation of Netech in winning clients. *See id.* But, as stated above, it is disputed whether PDT referenced Netech in a "trademark way." If so, this factor favors Plaintiffs; if not, it favors PDT. It is, in short, disputed.

As a majority of the factors for determining whether PDT's use of the Netech mark was likely to cause confusion are either highly disputed or neutral (and because there are genuine disputes about whether that use was in a "trademark way"), a reasonable jury could find that PDT has infringed on the Netech mark that Plaintiffs own. Accordingly, PDT's Motion for Summary Judgment is **DENIED** as to the Section 43(a) claims and ODTPA.

### E. Tort Claims

While the OUTSA created a statutory cause of action for trade secret misappropriation, it also "displace[d] conflicting tort, restitutionary, and other laws . . . providing civil remedies for misappropriation of a trade secret." OHIO REV. CODE § 1333.67. This provision, known as the "preemption clause," has been understood to "preempt not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets." *Stolle Machinery Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015). In order to determine when tort claims based in some way on misappropriation are displaced by the OUTSA, this Court considers "whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory

claim for trade secret misappropriation." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008) (quoting *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999)).  A tort claim rooted in the same facts as the statutory claim is preempted, but a claim with "a factual basis independent from the facts establishing the OUTSA claim . . . survives preemption." *Stolle Machinery Co.*, 605 F. App'x at 484 (internal quotation marks and citation omitted).

Plaintiffs here allege three tort claims against PDT and the Individual Defendants, who move for summary judgment on all three claims on the basis that they are preempted.

### 1.    Unfair Competition (Count VII)

A claim of unfair competition "ordinarily consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another. . . . The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Key Realty, Ltd. v. Hall*, 2021-Ohio-1868, ¶ 72, 173 N.E.3d 831, 852 (Ohio Ct. App. 2021) (quoting *Water Mgmt., Inc. v. Stayanchi*, 472 N.E.2d 715, 717 (Ohio 1984)), *aff'd*, 189 N.E.3d 785 (Ohio 2022).  Plaintiffs suggest that their unfair competition claim rests on two bases: *first*, PDT's alleged use of the Netech name to deceive clients; and *second*, the alleged circulation of false rumors by PDT employees that PNS was planning to close its Grand Rapids office.  (*See* Pls.' Resp. in Opp'n at 81–82, ECF No. 207).

For the same reasons that this Court found a genuine dispute about whether PDT's use of the Netech name constituted trademark infringement, *see supra*, this Court now finds that there is a genuine dispute as to whether PDT has engaged in unfair competition through its use of the Netech name.  (*See also* PDT Reply Br. at 17, ECF No. 259) (arguing that the unfair competition

claim fails for the same reasons as the Section 43(a) claim). This Court also finds that there is a genuine dispute as to whether Schaumleffel, who sent emails referring to PDT as "Netech 2.0" and "a Netech reboot," engaged in unfair competition. But because Plaintiffs have not shown that the other Individual Defendants used the Netech name in a trademark way, summary judgment is **GRANTED** on this claim as to Ely, Martin, and Schlotterer.

### 2. Unjust Enrichment (Count VIII)

An unjust enrichment claim requires three elements: "1) a benefit is conferred by a plaintiff on a defendant; 2) the defendant has knowledge of the benefit; and 3) the defendant retains the benefit under circumstances where it is unjust to do so." *Corp. Bertec v. Sparta Software Corp.*, No. 2:19-cv-04623, 2020 WL 2112162, at *8 (S.D. Ohio May 4, 2020) (internal citations omitted). Plaintiffs explain that their unjust enrichment claim "is based on PDT's attempts to take the Netech business back after Presidio paid approximately $250 million for Netech" by "using the 'Netech' name and goodwill." (Pls.' Resp. in Opp'n at 84, ECF No. 207). Even assuming *arguendo* that this comports with their claim as pleaded, Plaintiffs' claim falls short.

As noted, an unjust enrichment claim requires a benefit to be conferred by a plaintiff to a defendant. In 2016, Plaintiffs paid approximately $250 million to the Engens in purchasing Netech. But the Engens are not a party to this case; the defendants in this case, PDT and the Individual Defendants, did not receive the $250 million from Plaintiffs, nor any other benefit that Plaintiffs have identified.[10] (*See generally id.*). Of course, the fact that the Engens are not a party

---

[10] Plaintiffs provide no factual basis for their assertion that the Individual Defendants "improperly benefited from the business opportunities they gained from" the use of the "Netech" mark, especially as only one of the Individual Defendants is alleged to have used the Netech mark in his PDT work. (*See* Pls.' Resp. in Opp'n at 43, ECF No. 209). It is similarly difficult to credit Plaintiffs' vague claim that it gave "necessary resources, including institutional knowledge and long-standing customer relationships" to the Individual Defendants, who had all worked in the VAR industry and had client relationships prior to joining PNS; moreover, Plaintiffs have not explained how or in what way Plaintiffs unjustly retained benefits like "institutional knowledge."

to this case is not an absolute barrier as "a court may impose personal liability on a corporation's owner when there is fraud or the corporation 'is in fact a mere instrumentality or alter ego of its owner.'"  *Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 294 (S.D.N.Y. 2011) (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008)).  Plaintiffs imply that that may be the case, referencing PDT's conduct as inextricably tied to the Engens' "relentless campaign to take back the Netech business."  (Presidio Resp. in Opp'n at 85, ECF No. 207).

To pierce the corporate veil, "a plaintiff must show: (1) that the business entity and its owner operated as a single economic entity and (2) that there was an overall element of injustice or unfairness."  *Id.* (cleaned up).  Courts typically look to a variety of factors—"including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors"—to determine if the corporate form should be disregarded.  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996) (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600–01 (2d Cir. 1989)).

But because "the trappings of sophisticated corporate life are rarely present" in privately-held corporations, like PDT, *Waters*, 890 F.2d at 601, courts "must avoid an over-rigid preoccupation with questions of structure" when the corporate veil of a private company can be pierced.  *Bridgestone/Firestone*, 98 F.3d at 18 (internal quotation marks and citation omitted).  Rather, courts should focus on "apply[ing] the . . . overarching principle 'that liability is imposed to reach an equitable result."  *Id.* (quoting *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979)).  Here, PDT was founded and appears to be wholly-owned by the Engens and, if Plaintiffs' allegations are to be believed, engaged in an unjust act directed by the Engens.

62

In short, there is evidence in the record upon which a reasonable jury could conclude that PDT received a benefit from Plaintiffs via the Engens, that PDT does not have an express agreement with Plaintiffs, and that PDT has retained the benefit of the Netech name where it is unjust to do so.  Its motion for summary judgment is therefore **DENIED** for this claim.  But because there is no genuine dispute that Plaintiffs have not specified a benefit conferred on the Individual Defendants, their motion for summary judgment on this claim is **GRANTED**.

3. *Tortious Interference with Business Relationships (Count IX)*

A tortious interference with business relationships claim requires a plaintiff to show: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *First Star Logistics, LLC v. Bernard*, No. 1:16-cv-01070, 2020 WL 7698130, at *7 (S.D. Ohio Dec. 28, 2020) (quoting *Gentile v. Turkoly*, 2017-Ohio-1018, ¶ 24, 86 N.E.3d 991, 997 (Ohio Ct. App. 2017)).  This claim involves the same dispute as the unfair competition and trademark infringement claims: Plaintiffs allege that PDT and the Individual Defendants have engaged in tortious interference through their use of the Netech mark, while PDT and the Individual Defendants counter that they used the Netech mark in a proper manner.  (*See generally* PDT Reply Br. at 20, ECF No. 259; ID Reply Br. at 16, ECF No. 265).  As such, this Court's conclusion also mirrors its decision on the unfair competition claim.  The motions for summary judgment on this claim are **DENIED** except as to Ely, Martin, and Schlotterer.

## V. CONCLUSION

For the reasons stated more fully above, PDT's Motion to Preclude (ECF No. 173) are **GRANTED**; PDT's Motion for Summary Judgment (ECF No. 171) and the Individual Defendants' Corrected Motion for Summary Judgment (ECF No. 189) are **GRANTED IN PART**

**and DENIED IN PART;** Plaintiffs' Motion to Strike (ECF No. 164), Motion for Partial Summary Judgment (ECF No. 177), and Motion to Strike (ECF No. 205) are **DENIED**; and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 176) and Defendants' Motion to Preclude (ECF No. 199) are **DENIED AS MOOT**.

The following claims are **DISMISSED WITH PREJUDICE**: the breach of contract (Count 1) claims against the Individual Defendants; the trade secrets claims (Counts 2, 3) as to the alleged trade secrets identified in Part IV.C.1; the trademark infringement claim pursuant to Section 32 of the Lanham Act (Count 4); the unfair competition and tortious interference claims as to Ely, Martin, and Schlotterer (Counts 7, 9); and the unjust enrichment claim as to all Individual Defendants (Count 8).

**IT IS SO ORDERED.**

/s/ Algenon L. Marbley

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  August 11, 2023**

64